## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | | |
|---|---|---|
| **GLEN K. ALLEN,** | * | |
| 502 Edgevale Road | * | |
| Baltimore, Maryland 21210 | | |
| Baltimore City | * | |
| **Plaintiff,** | * | **Civil Action No.** |
| | * | |
| **v.** | * | |
| | * | **COMPLAINT** |
| **HEIDI BEIRICH** | * | |
| 1336 Woodward Avenue | * | |
| Montgomery, Alabama 36106 | | |
| **and** | * | |
| **MARK POTOK** | * | |
| 604 Hubbard Street | | |
| Montgomery, Alabama 36106-2302 | * | |
| **and** | * | |
| **THE SOUTHERN POVERTY** | * | |
| **LAW CENTER, INC.** | | |
| | * | |
| c/o Registered Agent | | |
| Teenie Hutchison | * | |
| 400 Washington Avenue | | |
| Montgomery, Alabama  36104 | * | |
| **Defendants** | * | |

### COMPLAINT

Plaintiff Glen K. Allen, Esq., for his complaint against defendants Heidi Beirich, Mark

Potok, and The Southern Poverty Law Center, Inc. ("SPLC"), alleges:

## INTRODUCTION

Providence has endowed humanity with the ability to grow and change.  Indeed, we have

a moral obligation to grow and change as we learn new aspects of reality.  At the pinnacle of the

means by which we grow and change should be robust dialogue, open debate, an aversion to

taboos, and genuine conversation.  This is the theory of our remarkable American traditions of

free expression, as embodied, among other ways, in the First Amendment.

But there are also other approaches to inevitable human discord.  One is to draw lines of

political or cultural orthodoxy, develop massive surveillance networks and extensive dossiers,

and severely punish perceived transgressors who cross those lines, seem to cross them, or even

seem to think about crossing them.

Beirich, Potok, and the SPLC, defendants in this case, have chosen this latter approach.

Motivated by lucrative fundraising aims and employing fundraising techniques decried across

the political spectrum as deceptive, the SPLC's avowed goal, under the leadership of Beirich,

Potok, and others, is to destroy, through public shaming, loss of employment, loss of reputation,

and other severe harms, groups and persons the SPLC broadly defines as its political enemies.

Glen Allen, plaintiff in this case, is one of Beirich's, Potok's, and the SPLC's victims.  The cause

of free expression itself is another, for the SPLC has become one of the most effective forces in

the country for stifling honest and robust debate on controversial issues.

Beirich, Potok, and the SPLC are entitled to espouse their outlook forcefully.  They are

*not* entitled, however, to the following actions, all alleged and supported in this complaint:  to

receive, pay for, and use stolen documents, including confidential documents and documents

protected by attorney client privilege, to tortiously interfere with Allen's prospective advantage in employment;  to defame him by publishing false statements that he was "infiltrating" the City of Baltimore's Law Department;  or to masquerade as a 501c3 public interest law firm dedicated to a tax exempt educational mission, when in reality the SPLC fails the basic requirements for this favored status because of its illegal actions (including numerous instances of mail and wire fraud), multiple violations of canons of professional ethics (including improper disclosure of confidential and privileged documents and failure to train its nonlawyer employees), orchestration of violations of the constitutional rights of the organizations and individuals it targets, and sensationalist supermarket tabloid style one-sided depictions of its victims.   The reality is that Beirich, Potok, and the SPLC have perfected what the scholar Laird Wilcox, speaking of the SPLC, called "ritual defamation": "a way of harming and isolating people by denying their humanity and trying to convert them into something that deserves to be hated and eliminated.  They accuse others of this but utilize their enormous resources to practice it on a mass scale themselves."  See Paragraph 21 of this Complaint.

In a moment of candor, defendant Potok, the editor-in-chief of the SPLC's Intelligence Report, boasted:  "We see this political struggle, right? …I mean, we're not trying to change anybody's mind. We're trying to wreck the groups, and we are very clear in our head, … we are trying to destroy them."   https://archive.org/details/MarkPotok  (track 13); see also Paragraphs 20 and 35 of this Complaint.   Beirich has similarly boasted that the SPLC has been "watching Allen like a hawk" because, according to Beirich and the SPLC, he "has the worst ideas ever." See Paragraph 47 of this Complaint.  So here is the essence:  Beirich, Potok, and the SPLC conducted lengthy and close surveillance on, plotted to destroy, and then did destroy Glen Allen, who was performing ethically and competently as an attorney for his adopted City of Baltimore,

because Beirich, Potok,  and the SPLC did not like what they thought was going on inside Allen's head.

The defendants' destruction of Allen was highly effective, causing his termination as an attorney for the City of Baltimore and ravaging the reputation as an attorney he had achieved over decades by performing ethical and competent work, including substantial pro bono work for African-Americans and others.  For the reasons set forth below, accordingly, Allen requests legal redress.

## PARTIES

1.    Plaintiff Glen K. Allen ("Allen") is a resident of Baltimore, Maryland.

2.    Defendant SPLC is a corporation formed under the laws of the state of Alabama. Its headquarters are in Montgomery, Alabama.  The SPLC's Intelligence Project is an association-in-fact formed within the SPLC consisting of and conducted by a subset of SPLC officers and employees, including defendants Heidi Beirich and Mark Potok.

3.    Defendant Heidi Beirich, the Director of the SPLC's Intelligence Project, is a resident of the state of Alabama.

4.    Defendant Mark Potok was an employee of the SPLC from 1997 until approximately 2017.  While employed at the SPLC, he was the editor-in-chief of the Intelligence Project's *Intelligence Report* and a SPLC Senior Fellow.  On information and belief, he is a resident of the state of Alabama or of some other state, other than Maryland.

## JURISDICTION AND VENUE

5.    This Court has diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of Maryland; defendants are citizens of Alabama or some other state, other than Maryland.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over the SPLC under § 6-103(b)(1), (b)(3), and / or (b)(4) of the Courts and Judicial Proceedings Article of the Maryland Annotated Code. Facts supporting jurisdiction include:  Beirich, as the SPLC's Director of Research and Director of its Intelligence Project, wrote and published an article on or about August 17, 2016 that tortiously interfered with Allen's prospective business advantage and injured him as a result of negligent training and supervision, as further described in this complaint;  this article was distributed in written form in Maryland and was published on the SPLC's website, which was accessible to and accessed by Maryland residents;   Beirich or someone at her direction sent press releases into Maryland, including into the offices of the Baltimore Sun and other newspapers that are distributed in Maryland, setting forth, summarizing, or otherwise calling attention to the August 17, 2016 article;  Beirich made telephone calls into Maryland in connection with the August 17, 2016 article;  Beirich gave telephone interviews to newspapers distributed in Maryland, including the Baltimore Sun, regarding the August 17, 2016 article; the SPLC for many years has regularly sent literature and fundraising appeals into Maryland, including to Allen, and garnered substantial sums from these appeals; the SPLC conducts surveillance on what it describes as hate groups in Maryland by, inter alia, using agents and informants in Maryland, often paid agents and informants, to infiltrate, spy on, and report to the SPLC regarding those groups and / or individuals the SPLC deems associated with the groups; and representatives of the SPLC, including Morris Dees, have visited Maryland to give lectures promoting the SPLC.

8.     This Court's exercise of personal jurisdiction over the SPLC comports with Constitutional due process standards. As described in the prior paragraph, the SPLC has purposefully established sufficient minimum contacts with Maryland such that it should reasonably anticipate being haled into court in Maryland.  Moreover, the assertion of personal jurisdiction is reasonable and consistent with traditional notions of fair play and substantial justice.  *See, e.g., Calder v. Jones*, 465 U.S. 783 (1984);  *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984).

9.     This Court has personal jurisdiction over Beirich under § 6-103(b)(1), (b)(3), and / or (b)(4) of the Courts and Judicial Proceedings Article of the Maryland Annotated Code.  Facts supporting jurisdiction include:  Beirich, as the SPLC's Director of Research and Director of its Intelligence Project, wrote and published an article on or about August 17, 2016 tortiously interfered with Allen's prospective business advantage and injured him as a result of negligent training and supervision, as further described in this complaint;  this article, pursuant to Beirich's direction, was distributed in written form in Maryland and published on the SPLC's website, which was accessible to and accessed by Maryland residents;   Beirich or someone at her direction sent press releases into Maryland, including into the offices of the Baltimore Sun and other newspapers that are distributed in Maryland, setting forth, summarizing, or otherwise calling attention to the August 17, 2016 article;  Beirich made telephone calls into Maryland in connection with the August 17, 2016 article;  Beirich gave telephone interviews to newspapers distributed in Maryland, including the Baltimore Sun, regarding the August 17, 2016 article;  Beirich was substantially involved in the SPLC's surveillance on what it describes as hate groups in Maryland and directly spoke and coordinated with the agents and informants the SPLC has

used and continues to use to infiltrate, spy on, and give reports to the SPLC regarding those groups and / or individuals Beirich deems associated with the groups.

10.     This Court's exercise of personal jurisdiction over Beirich comports with Constitutional due process standards. As described in the prior paragraph, Beirich has purposefully established sufficient minimum contacts with Maryland such that she should reasonably anticipate being haled into court in Maryland.  Moreover, the assertion of personal jurisdiction is reasonable and consistent with traditional notions of fair play and substantial justice.

11.   This Court has personal jurisdiction over Potok under § 6-103(b)(1), (b)(3), and /or (b)(4) of the Courts and Judicial Proceedings Article of the Maryland Annotated Code.  Facts supporting jurisdiction include:  Potok, as the the editor-in-chief of the SPLC Intelligence Project's *Intelligence Report* and a SPLC Senior Fellow, oversaw or otherwise worked closely with Beirich in the publication of the article Beirich wrote on or about August 17, 2016 that tortiously interfered with Allen's prospective business advantage and injured him as a result of negligent training and supervision, as further described in this complaint;  this article, pursuant to Potok's and Beirich's direction, was distributed in written form in Maryland and published on the SPLC's website, which was accessible to and accessed by Maryland residents;   Potok assisted or approved Beirich or someone at her direction in sending press releases into Maryland, including into the offices of the Baltimore Sun and other newspapers that are distributed in Maryland, setting forth, summarizing, or otherwise calling attention to the August 17, 2016 article;  Potok assisted or approved Beirich's involvement in the SPLC's surveillance on what it describes as hate groups in Maryland, in which Beirich, and on information and belief Potok, directly spoke and coordinated with the agents and informants the SPLC  has used and continues

to use to infiltrate, spy on, and give reports to the SPLC regarding those groups and / or

individuals Potok and Beirich deem associated with the groups.

12.      This Court's exercise of personal jurisdiction over Potok comports with

Constitutional due process standards. As described in the prior paragraph, Potok has purposefully

established sufficient minimum contacts with Maryland such that he should reasonably anticipate

being haled into court in Maryland.  Moreover, the assertion of personal jurisdiction is

reasonable and consistent with traditional notions of fair play and substantial justice.

13.      This Court also has personal jurisdiction over Beirich and Potok as to this

complaint's RICO claim pursuant to 18 U.S.C. § 1965(b) and (d), and supplemental jurisdiction

over all defendants as to the pendent state law claims pursuant to 18 U.S.C. § 1367.

14.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 in that a

substantial part of the events or omissions giving rise to this action occurred in this judicial

district and the defendants are subject to personal jurisdiction here.

## FACTUAL ALLEGATIONS

### A.   THE SPLC

15.   Although the SPLC (including its Intelligence Project) is respected by many, its

conduct for decades has provoked sharp, well-founded criticism for a multitude of reasons and

across a broad spectrum of political viewpoints.   For example:

16.      **The SPLC's Aim Is Not Merely to Monitor but to Destroy the "Hate**

**Groups" It Defines**.  The SPLC's 501c3 tax status rests on its supposed educational mission of

monitoring "hate groups" and hateful persons, as it defines them.  The reality, however, is that

the SPLC does not merely monitor but seeks to destroy these groups and persons.  Not only does

the SPLC's conduct demonstrate its destructive aims, but Potok and Beirich have boasted about them. Many observers have noted this.

17. For example, Karl Zinsmeister, former Director of the White House Domestic Policy Council and a leading national authority on philanthropy, recently noted in an article in the Spring 2017 issue of *Philanthropy Magazine*:

> "It is entirely fair to disagree with any of these charities or individuals [on the SPLC "Hate List"]—but utterly unfair to insist they are hate criminals. The largest category on the SPLC "haters" list is "anti-government groups." (663 entries!) This dragnet catches the tea party and patriot organizations that are suspicious of centralized power, which last we checked was a long and honorable American tradition.
>
> What is *not* part of an honorable American tradition is the course of action prescribed by top SPLC leader Mark Potok: "Sometimes the press will describe us as monitoring hate crimes and so on…. I want to say plainly that our aim in life is to destroy these groups, to completely destroy them." (To see him say it, start at minute 1:35 of this video: www.youtube.com/watch?v=fnTz2ylJo_8&feature=reImfu)."

https://www.philanthropyroundtable.org/philanthropy-magazine/article/spring-2017-briefly-noted (eighth through ten paragraphs).

18. As a further example, Professor Carol Swain, a retired professor at Vanderbilt University and an African-American, in an article in the September 11, 2017 *Wall Street Journal* described how the SPLC smeared her and targeted her for destruction because she had advocated a more inclusive dialogue on race issues than the SPLC is willing to permit. Professor Swain stated:

> "The SPLC's retaliation was vicious and effective. . . . On Oct. 17, 2009, my photo appeared on the front page of my local newspaper, the Tennessean, with the quote: 'Carol Swain is an apologist for white supremacists.' That was Mark Potok, at the time the SPLC's national spokesman. The context for Mr. Potok's attack was a review I gave for a film titled 'A Conversation About Race.' I endorsed it for classroom use because it offered a perspective on race rarely encountered on university campuses. Mr. Potok argued that the filmmaker was a bigot. I felt then and now that the perspective needed to be heard.
>
> This negative article was featured on the front pages of several newspapers and it went viral, especially in black media outlets. . . . Being targeted by the SPLC has had a

lasting impact on my life and career. Offers from other universities ended and speaking opportunities declined. Once you've been smeared in this way, mainstream news outlets are less likely to cite you as an expert of any kind.

Yet today I wear the SPLC's mud as a badge of honor because I know I am in the company of many good men and women who have been similarly vilified for standing for righteousness and truth. Other SPLC targets have included Ben Carson (who eventually received an apology and retraction), Somali refugee Ayaan Hirsi Ali, terrorism expert Steve Emerson, political scientist Guenter Lewy (who successfully sued the SPLC), attorney Robert Muise, Frank Gaffney of the Center for Security Policy, and Princeton professor Robert P. George. The SPLC has tagged Mr. George, a devout Catholic intellectual, as 'anti-LGBT.'

Whatever label the SPLC assigns, such smears are harmful and designed to destroy the individual's credibility and ability to have influence in the public square.

Some of those vilified by the SPLC have been subjected to even worse treatment. The Family Research Council and House Majority Whip Steve Scalise have been violently attacked by individuals inspired by the propaganda the SPLC regularly dishes out—which is often accepted without criticism and passed on by media, law-enforcement agencies and universities."  https://www.wsj.com/articles/what-its-like-to-be-smeared-by-the-southern-poverty-law-center-1505171221

19.   Further, on September 6, 2017 leaders of 47 nonprofits sent an open letter to the media warning that the SPLC's list of so-called "hate groups" is false and lacks any semblance of credibility.  The letter states the SPLC is "a discredited, left-wing, political activist organization that seeks to silence its political opponents with a 'hate group' label of its own invention and application that is not only false and defamatory, but that also endangers the lives of those targeted with it."  The leaders cited both political and media figures debunking the SPLC and highlighted the FBI's removal of the SPLC as a "trusted source" for Hate Crimes in 2014.

http://downloads.frc.org/EF/EF17I05.pdf

20.   As noted in the Introduction to this complaint, Potok openly proclaims the SPLC's destructive aims.  The SPLC's anti-free expression motives are all the more egregious given that it specifically targets ideas, as Potok has also acknowledged: "Our criteria for a hate group, first of all, have nothing to do with criminality, or violence, or any kind of guess we're making about

'this group could be dangerous.' It's strictly ideological." https://archive.org/details/MarkPotok

(track 9).

21.     Laird Wilcox, a respected scholar on political fringe groups, winner of the

Mencken Award, and longtime ACLU member, in a 2010 interview noted the SPLC's modus

operandi of using ritual defamation to destroy groups it characterizes as hate groups:

> "When you get right down to it, all the SPLC does is call people names.  It's
> specialized a highly developed and ritualized form of defamation, however—a way of
> harming and isolating people by denying their humanity and trying to convert them into
> something that deserves to be hated and eliminated. They accuse others of this but utilize
> their enormous resources to practice it on a mass scale themselves. . . Anyone attacked
> by the SPLC is basically up against a contest of resources, from the ability to engage
> legal counsel, to the access to fairness in media treatment, to the ability to survive the
> financial destruction of a reputation or a career. What they do is a kind of bullying and
> stalking. They pick people who are vulnerable in terms of public opinion and simply
> destroy them. Their victims are usually ordinary people expressing their values, opinions,
> and beliefs—and they're up against a very talented and articulate defamation machine."
> http://www.thesocialcontract.com/artman2/publish/tsc_20_3/tsc_20_3_wilcox_interview.shtml

22.    **The SPLC Engages in Actions that Are Illegal, Tortious, Unethical, and**

**Violative of Internal Revenue Service Requirements for a 501c3 Organization.**   The SPLC's

501c3 tax exempt status rests on the predicate that it is a public service law firm – National

Taxonomy of Exempt Entities (NTEE) Code I83 – with an educational mission.   Under Internal

Revenue Service Code 4.76.9.3, which defines the Public Interest Criteria a public service law

firm must adhere to to receive or maintain 501c3 tax status:

>  2.   The organization can not attempt to achieve its objectives by illegal activity
>      or through a program of disruption of the judicial system.

>  3.   The organization can not violate any canons of legal ethics.

23.    Given that the SPLC presents itself, for tax and other purposes, as a law firm, all its

employees, lawyers and nonlawyers alike, including defendants Beirich and Potok, are subject to

compliance with the Model Rules of Professional Conduct.  *See* Model Rule of Professional

Conduct 5.3.

24.     The SPLC, its employees, and the Intelligence Project, however, not only commit

illegal, tortious, and unethical actions but boast about them.  These include:

- Receipt of stolen property, as described in Paragraphs 58-67 of this complaint.

- Commercial bribery, as described in Paragraphs 58-67 of this complaint.

- Multiple instances of mail and wire fraud, as described in Paragraphs 101-118 and 145-151 of this complaint.

- Making false statements on a tax form, specifically on the SPLC's 2016 Form 990, in which the SPLC falsely claimed it had not participated in partisan political campaign activity when in reality it had opposed Trump and other conservative republican candidates in over a hundred published statements -- and boasted about its partisan campaigning -- as described in Paragraphs 116-117 of this complaint.

- Tortious actions including tortious interference with contract and with prospective advantage, defamation, and negligent training and supervision, as described in Paragraphs 159-197 of this complaint.

- Violations of attorney Rules of Professional Conduct, including:

    o Rule 8.4(b) ("It is professional misconduct for an attorney to: (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects"), as described in Paragraphs 58-67, 101-117, and 119 of this complaint;

    o Rule 8.4(c) ("It is professional misconduct for an attorney to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation"), as described in Paragraphs 58-67, 94, 101-117, and 118 of this complaint;

    o Rule 8.4(d) ("It is professional misconduct for an attorney to: (d) engage in conduct that is prejudicial to the administration of justice"), as described in Paragraphs 58-67, 94, 101-117, and 118 of this complaint;

    o Rule 4.4(a) ("In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person"), as described in Paragraphs 58-67 of this complaint;

    o Rule 4.4(b) ("A lawyer who receives a document that on its face appears to be subject to the attorney-client privilege or otherwise confidential, and who knows or reasonably should know that the document was inadvertently sent, should promptly notify the sender and (1) abide by the reasonable instructions of the sender regarding the disposition of the document; or (2) submit the issue to an

appropriate tribunal for a determination of the disposition of the document"), as described in Paragraphs 71-76 and 78 of this Complaint;

- o Rule 4.1(a) ("In representing a client a lawyer shall not knowingly: (1) make a false statement of material fact or law to a third person; or (2) fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client"), as described in Paragraphs 58-67, 94, 101-117, and 119 of this complaint;

- o Rule 4.2(a) ("[I]n representing a client, a lawyer shall not communicate about the subject of the representation with a person who the lawyer knows is represented in the matter by another lawyer unless the lawyer has the consent of the other lawyer or is authorized by law or court order to do so"), as described in Paragraphs 58-67 of this complaint;

- o Rule 1.15(b) ("(b) Upon receiving funds or other property in which a client or third person has an interest from a source other than the client or the third person, a lawyer shall promptly notify the client or third person"), as described in Paragraphs 71-74 and 78 of this complaint;

- o Rule 5.3 ("With respect to a nonlawyer employed or retained by or associated with a lawyer: (a) A partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer; (b) A lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer"), as described in Paragraphs 71-75 of this complaint;

- o Rule 1.2(b) ("A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities"), as described in Paragraph 85 of this complaint.

- o Rule 6.2 comment ("All lawyers have a responsibility to assist in providing pro bono publico service. See Rule 6.1. An individual lawyer fulfills this responsibility by accepting a fair share of unpopular matters or indigent or unpopular clients"), as described in Paragraph 85 of this complaint.

- Morris Dees, acting on behalf of the SPLC, has menaced and harassed with a loaded weapon, specifically a shotgun.  On page 101 of his 1991 autobiography, *A Season For Justice*, Dees brags about holding a shotgun to the head of a man named Claude Henley. Mr. Dees repeats the claim on page 101 of his second autobiography in 2003, *A Lawyer's Journey: The Morris Dees Story*.  See  http://codes.findlaw.com/al/title-13a-criminal-code/al-code-sect-13a-6-23.html (Alabama criminal statute prohibiting menacing); http://codes.findlaw.com/al/title-13a-criminal-code/al-code-sect-13a-11-8.html (Alabama criminal statute prohibiting harassment).

25.   In addition to the 501c3 requirements specific to a public interest law firm, the

SPLC, like other 501c3 tax exempt organizations, is subject to the general prohibition against

participating or intervening in (including the publishing or distributing of statements) "any political campaign on behalf of or in opposition to any candidate for public office." 26 CFR 1.501(c)(3) – (c)(3)(iii);  https://www.law.cornell.edu/cfr/text/26/1.501%28c%29%283%29-1. Even if a statement does not explicitly advise the public to vote for or against a candidate, the prohibition is violated if there is any message favoring or opposing a candidate for public office. Moreover, 501c3 exemption is lost from participation in political campaigning even if the participation did not form a substantial part of the organization's activities. *United States v. Dykema*, 666 F.2d 1096, 1101 (7th Cir. 1981).

26.    The SPLC has violated this prohibition flagrantly and repeatedly, as described in Paragraphs 116-117 of this complaint.

27.    **The SPLC's Dominant Objective Is Lucrative Fundraising**.  The SPLC has developed highly remunerative fundraising techniques during the 45 years since its creation in 1971 by Morris Dees.  By 1994, its net assets totaled approximately $52 million; by 2005, approximately $168 million.  By 2016, its total endowment fund was $319,283, 961 and its total assets were $353,178,928. https://www.splcenter.org/sites/default/files/splc_fs_103116.pdf. For the fiscal year 2017, its endowment exploded to $432 million.

https://rkeefe57.wordpress.com/2018/04/

28.    Each year adds substantially to its net assets.   In 2015, for example, according to the Charity Navigator its net income exceeded its expenses by nearly $9 million.  According to the SPLC's 2015 Form 990 (page 10),

https://www.splcenter.org/sites/default/files/990_103116.pdf   in 2015 it paid $14,466,227 in "compensation to unqualified persons."  By 2017, its net income exceeded operational expenses by a staggering $76,589,303.  https://rkeefe57.wordpress.com/2018/04/.  The SPLC

parks large amounts of its huge endowment in offshore accounts, a questionable practice for a domestic 501c3 nonprofit.

29.   A recent article in *Politico* entitled "Has A Civil Rights Stalwart Lost Its Way?" notes that the SPLC now has 250 staffers in four states and that its enormous headquarters building in Montgomery, Alabama "is testament to the fact that, in America, even fighting racism can be very good business."

http://www.politico.com/magazine/story/2017/06/28/morris-dees-splc-trump-southern-poverty-law-center-215312.   The article included the following photograph of one floor of the inside of the SPLC's office:



**SPLC H.Q.** Morris Dees and Richard Cohen sit in the organization's open office space.

30.   This incredible fundraising richesse has captured the SPLC's soul and skewed its

mission.  A legion of critics, over many years and across the political spectrum, have noted this

corruption.  For example:

- "[T]he SPLC's core mission . . . is to separate progressives from their dollars."  "The SPLC has become a kind of Weimar Republic of hate inflation.  Its list of 'hate groups' looks increasingly like a way of attacking ordinary conservatives."  "An easy way to ratchet up hatred, and the passion that makes people open their checkbooks, is to accuse others of hate."  August 23, 2018 article by Kyle Smith entitled "Essentially a Fraud" in the National Review Magazine. https://www.nationalreview.com/magazine/2018/09/10/southern-poverty-law-center-essentially-a-fraud/

- "[The SPLC] has become a caricature of itself, labeling virtually anyone who does not fall in line with its left-wing ideology an 'extremist' or 'hate group.'"  "Sliming conservatives is big business."  June 22, 2018 article by Marc Thiessen entitled "The Southern Poverty Law Center Has Lost All Credibility" in The Washington Post. https://www.washingtonpost.com/opinions/the-southern-poverty-law-center-has-lost-all-credibility/2018/06/21/22ab7d60-756d-11e8-9780-b1dd6a09b549_story.html?utm_term=.8c0cb2dfaee3

- "The SPLC is a cash-collecting machine. In 2015 it vacuumed up $50 million in contributions and foundation grants, a tidy addition to its $334 million holdings of cash and securities and its headquarters worth $34 million. 'They've never spent more than 31 percent of the money they were bringing in on programs, and sometimes they spent as little as 18 percent. Most nonprofits spend about 75 percent on programs,' noted Jim Tharpe, managing editor of the SPLC's hometown newspaper, the *Montgomery Advertiser*, in a talk at Harvard's Nieman Foundation for Journalism. Other reporters who have wised up to the SPLC hustle have noted in exposés how ironic it is that a group proclaiming itself a civil-rights organization has rarely used black attorneys or included any significant number of African Americans on its staff or board."  Karl Zinsmeister, *Philanthropy Today* (Spring 2017):  https://www.philanthropyroundtable.org/philanthropy-magazine/article/spring-2017-briefly-noted

- "The SPLC's main role is as a massively funded propaganda machine . . . SPLC founder Morris Dees was inducted into the Direct Marketing Hall of Fame in 1998.  That should tell you a lot.  Dees' experience as an ultra-successful direct mail marketer well precedes his SPLC days.  Perhaps he employed those skills

while working on George Wallace's 1958 gubernatorial campaign . . . But critics say he got especially wealthy while at the SPLC, building what they've called his 'poverty palaces,' by guilt-tripping and virtue–signaling a load of affluent white donors who identify as progressives."  Stella Morabito, *The Federalist* (May 17, 2017), *Twelve Ways the Southern Poverty Law Center Is a Scam to Profit from Hate-Mongering*:  http://thefederalist.com/2017/05/17/12-ways-southern-poverty-law-center-scam-profit-hate-mongering/

- "'Alas, these days the SPLC is mainly a fundraising machine,'" said Gail Heriot, a US Commission on Civil Rights member who voted against Friday's resolution. "'The more it can persuade its donors that hate groups have penetrated every nook and cranny of American society, the more money it can raise. . . . The SPLC has no credibility with anyone — on the left or the right — who is familiar with its methods.'"  (December 5, 2016 article in NY Post:  http://nypost.com/2016/12/05/report-buried-trump-related-hate-crimes-against-white-kids/)

- "Morris Dees is a con man and fraud, as I and others, such as U.S. Circuit Judge Cecil Poole, have observed and as has been documented by John Egerton, Harper's, the Montgomery Advertiser in its 'Charity of Riches' series, and others.  The positive contributions Dees has made to justice – most undertaken based upon calculations as to their publicity and fundraising potential – are far overshadowed by what Harper's described as his 'flagrantly misleading' solicitations for money. He has raised millions upon millions of dollars with various schemes, never mentioning that he does not need the money because he has $175 million and two 'poverty palace' buildings in Montgomery. He has taken advantage of naive, well-meaning people – some of moderate or low incomes – who believe his pitches and give to his $175-million operation. He has spent most of what they have sent him to raise still more millions, pay high salaries, and promote himself. Because he spends so much on fundraising, his operation spends $30 million a year to accomplish less than what many other organizations accomplish on shoestring budgets." Joseph Farah, May 30, 2012 article in World Net Daily.com, quoting a 2007 letter from Stephen Bright, Professor at Yale Law School and Director of the Southern Center for Human Rights, to the Dean of the University of Alabama Law School: http://www.wnd.com/2012/05/morris-dees-is-a-con-man-fraud/

- "The Southern Poverty Law Center is a thriving business . . . Its business is fundraising, and its success at raking in the cash is based on its ability to sell gullible people on the idea that present-day America is awash in white racism and anti-Semitism, which it will fight tooth-and-nail as the public interest law firm it purports to be. That might lead a skeptic to wonder why it spends little on litigation and why Mr. Dees pockets a lot of money sent in by panicked donors who buy into the smear campaigns against organizations or prominent individuals who question racial preference programs. . . .  To me and to other observant conservatives, the Southern Poverty Law Center is a clever scam,

relentlessly cultivating for profit the fear that this nation is filled with Klansmen and rife with people eager to perpetrate genocide." (December 8, 2008 article in Baltimore Sun by R. Smith: http://articles.baltimoresun.com/2008-12-03/news/0812020076_1_pietrzak-poverty-law-southern-poverty)

31. **The SPLC Is Hypocritical**.   The SPLC does not apply the same standards to itself that it uses for the "hate groups" it defines.   One of its **favored** smear tactics is to proclaim "links" or "ties" between disturbed individuals who commit violent acts and "hate groups" based on highly tenuous connections between the individuals and the groups.   For example, a November 2015 article on the SPLC website that blazons the headline "Former National Alliance Supporter Charged with Murder and Evidence Tampering" describes a man named Collins who was charged with murdering a man named Kelly.   Collins is described as a National Alliance "supporter" because he once bought literature from the National Alliance;  no connection whatever is shown in the article between that purchase and Kelly's murder. Nonetheless the SPLC links the murder to the National Alliance.

32.   Contrast this to the 2012 Floyd Corkins incident, in which Corkins,  inspired by the SPLC's designation of  the Family Research Council (FRC),  an American conservative Christian group, as a "hate group" and using the SPLC website's Hate Map for approximate directions, walked into the FRC's offices with the intent to kill as many people as he could and did shoot and badly wound a security guard.  http://www.cnn.com/2013/02/06/justice/dc-family-research-council-shooting/;  http://hotair.com/archives/2013/04/24/frc-shooter-i-targeted-them-because-splc-list-said-they-were-anti-gay/.  The SPLC, however, decries as "outrageous" any attempt to tie or link it to Corkins' murderous rampage.  In short, if a person buys literature from an SPLC "hate group" and then commits a crime, the SPLC links the person to the hate group, even if the purchase of literature had no connection with the crime; but if a person explicitly uses

the SPLC "hate group" designation and Hate Map as a blueprint for murder –   no "links" or "ties" there.

33.     The SPLC's double standards were also prominently displayed with respect to James Hodgkinson's murderous attacks on conservative congressmen in June 2017.  The SPLC acknowledged that Hodgkinson was "consumed with anti-Trump anger," https://www.splcenter.org/hatewatch/2017/06/14/gunman-who-fired-congressional-baseball-team-consumed-anti-trump-anger but omitted to acknowledge that the SPLC had aggressively fomented anti-Trump anger for well over a year prior to the attacks.  A filing in April 2017 by the Federation for American Immigration Reform (FAIR) with the Secretary of the Treasury details well over a hundred instances in which the SPLC viciously attacked Trump in the period from June 2015 to July 2016.  http://www.fairus.org/DocServer/media/SPLC_Complaint.pdf. Hodgkinson was a follower of the SPLC, having liked it on Facebook. Yet the SPLC accepted no responsibility for Hodgkinson's actions.  One commentator described the SPLC's disclaimers as follows:  "SPLC's president Richard Cohen naturally and predictably disavowed any influence or responsibility whatsoever, though it has been stirring up hatred by demonizing groups like FRC and the American Family Association for years. . . . They're like a guy who gives gasoline and matches to a teenager and then feigns innocence and utter shock when the kid burns down a house." http://www.afa.net/the-stand/culture/2017/06/splc-should-add-liberals-to-its-hate-group-list/

34.     The SPLC's demonizing of the political scientist and author Charles A. Murray also manifests the SPLC's double standards.  Murray has disclosed that he has been subjected to threats and physical violence because of the SPLC's characterization of him as an "extremist," https://www.aei.org/publication/reflections-on-the-revolution-in-middlebury/,  a characterization

permeated with false statements.  https://www.aei.org/publication/charles-murrays-splc-page-as-edited-by-charles-murray/.  The SPLC, however, has never accepted any responsibility for the physical assaults on Murray.

35.     The SPLC uses the word "Poverty" in its name but in reality is fabulously wealthy. Much of that wealth finds its way into its luxurious offices, which Stephen Bright (whose credentials as head of the Southern Human Rights Center are impeccable) characterized as "Poverty Palaces," and into the sumptuous lifestyle of Morris Dees, who has been married at least five times.  http://24ahead.com/s/montgomery-advertiser.   In reality, although the SPLC has "Poverty" in its title, its aims have little to do with alleviating poverty, as defendant Potok acknowledged in a 2008 interview:  "In the 70's … 'poverty law' was actually the phrase … it was a phrase used that just applied to … essentially … civil rights law … to kind of human rights legal actions. I know a couple years ago there was a big discussion internally [at the SPLC], 'Should we change our name to something else?' . . . People think, you know, that it's all about, sort of, defending poor people, and that's not really, exactly what our mission is. By that time, people knew the name so well that, you know, we made, I think, the obviously right decision not to change the name."   https://archive.org/details/MarkPotok at track 1.

36.     The SPLC postures itself as a defender of African-Americans but has been, and remains, subject to well-grounded criticism regarding its own treatment of African-Americans. A 1994 series in the Montgomery, Alabama *Advertiser,* for example, noted the lack of African-Americans in the SPLC's management and the complaints by several African-Americans of poor, indeed racist, treatment by the SPLC:  "Of 13 black former center staffers contacted, 12 said they either experienced or observed racial problems inside the Law Center. Three said they heard racial slurs, three likened the center to a plantation and two said they had been treated

better at predominantly white corporate law firms. . .  According to internal memorandums, staffers have accused Morris Dees, the center's driving force, of being a racist and black employees have 'felt threatened and banded together.'"

https://rkeefe57.wordpress.com/montgomery-advertiser-series/  And for 47 years, up to and including 2017, there have been no African-Americans among the SPLC's highest paid officers. https://rkeefe57.wordpress.com/2018/04/ (April 15, 2018 article); https://rkeefe57.wordpress.com/2015/03/01/splc-executive-suite-2015-as-white-as-ever/.

37.    **The SPLC Has an Anti-Christian Bias**.   The SPLC's definition of a "hate group" is so permeated with subjective criteria that the SPLC can, and does, use it selectively to support its own political agenda.  As George Yancey, a professor at the University of North Texas (and an African-American) noted in his recent study, "As our society became more politically partisan, SPLC cemented its position as speaking for those with progressive political and social attitudes. Rather than developing into an objective clearinghouse for the identification of hatred – no matter where the source of that hatred may develop – SPLC has become a useful organization for progressives to legitimate their battle against conservatives. Since conservative Christians are categorized as opponents there is little, if any, incentive for SPLC to recognize hateful expressions against Christians, because doing so actually works against the social vested interest of the group."  http://www.christianpost.com/news/southern-poverty-law-center-biased-in-labeling-family-research-council-a-hate-group-academic-study-argues-115612/; http://www.breitbart.com/big-government/2014/03/10/southern-poverty-law-center-ingores-liberal-hate/

38.    Another example of the SPLC's anti-Christian bias was noted by Peter Pappas in his book *Fanning the Flames* (2012) at page 192:  "The SPLC's anti-Christian agenda is

betrayed as much by the groups it has chosen *not* to list as by those it lists  . . . the SPLC's antigay list [which includes numerous Christian organizations] does not contain the name of a **single** mosque or Muslim organization. Maybe the SPLC is unaware of how Sharia law deal with homosexuals . . . The Islamic Society of North America (ISNA) calls homosexual relationships a 'deviation' from the law of Allah.  ISNA is not listed as an anti-gay hate group on the SPLC site . . The Council on American-Islamic Relations (CAIR) . . . [is] an organization that aims to implement Sharia law, an Islamic legal system that punishes homosexuality with death.  CAIR is likewise not listed by the SPLC as an anti-gay hate group." *See also*  Awadh Binhazim, Mulsim Chaplain and Adjunct Professor at Vanderbilt, acknowledging and defending  Sharia law that requires death for homosexuals;  the SPLC has not criticized Binhazim:

https://www.firstthings.com/blogs/firstthoughts/2010/02/chaplain-at-vanderbilt-university-defends-death-penalty-for-homosexuals

## B.  ALLEN

39.    Allen comes from a broken home.  Constant changes of residence in his youth, plus problems in his family life, engendered in him a solitary, cautious, and reticent nature, highly prone to keeping his thoughts to himself.

40.    As an at-risk teenager, he was fortuitously introduced to the local University of Chicago Great Books Discussion program in the Colorado town where he was then living. Reading the Great Books became Allen's refuge, helping him avoid the drugs and crime that entangled many around him.  It ingrained in him the attitude that no idea, however widely accepted, was sacrosanct.[1]

---

[1] To its credit, the University of Chicago continues to this day to support and defend open discussion on controversial issues.  http://www.marketwatch.com/story/why-one-university-allows-controversial-speakers-2017-03-10

41.     In 1974 Allen graduated from the Colorado College with a degree in philosophy.

He was accepted into several graduate programs in philosophy, but, unable to pay tuition, did not

attend.

42.     Seeking to raise money to attend law school, in 1978 Allen joined the Army as an

enlisted man.   In September 1982, having completed his term of enlistment, he was discharged.

He had served honorably and been promoted twice.

43.     In the fall of 1984, Allen began law school at the University of Maryland.  He was

a diligent student and did well in law school, finishing near the top of his class and serving as

Executive Director of the law review.

44.     In 1987, following graduation from law school, Allen clerked for Chief Judge

Robert Murphy of the Maryland Court of Appeals.

45.     In 1988, Allen began as an associate in the litigation department of what was then

Piper and Marbury, now DLA Piper.  He became Of Counsel in that firm in 1998.  He retired

from DLA Piper in December 2015.

46.     By 1991, Allen had been admitted to the Maryland bar and the bars of the federal

District Court for the District of Maryland, the Fourth Circuit Court of Appeals, the Tenth

Circuit Court of Appeals, and the United States Supreme Court.  In 2013, he was admitted to the

District of Columbia bar.  In 2017, he was admitted to the bar of the United States District Court

for the District of Columbia.  He remains in good standing in all these bars.

47.     Beirich, the Intelligence Project, and the SPLC operate a vast surveillance

network whose surveillance has included combing through pleadings to review any case in

which Allen was involved, and Beirich has specifically boasted that she and the SPLC have been

"watching Allen like a hawk." http://www.baltimoresun.com/news/maryland/investigations/bs-md-sun-investigates-hatewatch-blog-20160820-story.html.  Accordingly, Beirich, Potok, and the SPLC (including the Intelligence Project) were well aware, at the time of their publication of the August 17, 2016 article, that Allen has been active in *pro bono* matters, often on behalf of African-Americans.  For example:

- As the SPLC (including the Intelligence Project) knew, Allen devoted substantial time (over 100 hours) *pro bono* to the defense of Arthur Lloyd, an incarcerated African-American federal Deputy Marshall who had shot and killed a white Navy seaman, in *Stowers v. United States*, PJM 07-2912 (U.S.D.C. Md) (wrongful death civil case following Lloyd's criminal conviction for manslaughter);  Judge Peter Messitte, who had requested only 10 hours from Allen, commended Allen for "an admirable job in representing Lloyd" and his "considerable efforts on Lloyd's behalf."

- As the SPLC (including the Intelligence Project) knew, Allen, working with Professor Michael Milleman of the University of Maryland School of Law, and Michael Bakhama of DLA Piper, in 2015 prepared and filed an amicus brief in the Court of Appeals of Maryland in *State of Maryland v. Waine*, (Md. No. 90, Sep. Term 2014) on behalf of the Maryland Law School's Clinical Law Program and Social Work Services Program and the Maryland Restorative Justice Initiative, Inc., in support of the Appellee, Peter Sutro Waine. http://md.findacase.com/research/wfrmDocViewer.aspx/xq/fac.20150828_0001051.MD.htm/qx.  The *Waine* case raised the issue of overruling *Unger v. State*, 427 Md. 383 (2012)  (the amicus brief opposed this); overruling *Unger* would have

had dire implications for hundreds of African-Americans sentenced to life in

prison in prior decades.  In September 2016, after the August 17, 2016 article by

Beirich and the SPLC described in this complaint, Professor Milleman sent Allen

an unsolicited email, stating:

> Glen . . . I am writing to thank you for your great work on Unger, for over 200 African Americans who were sentenced to life-in-prison in the 1960s and 70s on convictions for murder and rape. Many of these convictions were flawed, in significant part, because of race discrimination. Again, I really appreciate your superb help, and more importantly, the many good men who are coming home in part because of it.  Thank you.
> P.S. And yes, I have seen the press. I trust, instead, the facts I see before me. Thanks again for your great work!
> Mike
> Life is reborn every day.
> --------------------------------------------

- As the SPLC (including the Intelligence Project) knew or could easily have

   learned, for four years, as part of a DLA Piper *pro bono* program, Allen was the

   mentor for a fatherless African-American youth named D'Andre Johnson.  The

   goal of the DLA program was to assure that at-risk African-American young

   people graduated from high school.  Allen, and the DLA Program, succeeded with

   respect to D'Andre, who graduated from Northwestern High School.  Allen's

   efforts on behalf of D'Andre included visiting his high school, encouraging him

   to go out for the track team, and trying to find work for him at Walmart.

48.    As Beirich and the SPLC (including the Intelligence Project) also knew (because

it was described in a local newspaper), Allen gave money to a Native American scholarship fund

created to honor Allen's grandfather,  and in 2012, as shown in the following photograph,

presented the scholarship award to a Native American youth.



49.     Allen retired from DLA Piper on December 31, 2015, after more than 27 years of service at the firm.  By this date, DLA Piper had become one of the largest law firms in the world.  Allen, wanting to stay active as an attorney, created a website.  The website included many testimonials from his former colleagues, including many colleagues with whom he had worked for over two decades and who now occupied high management positions at the firm. The testimonials praised Allen's character, legal abilities, and accomplishments:

> "Glen and I worked closely together for many years. He is one of the best critical thinkers, legal writers and problem solvers I have ever known."

"Glen Allen is a lawyer's lawyer. He is one of the best problem solvers with whom I have worked in my legal career. He welcomes and solves complex legal problems which elude others."

"Glen enhanced our intellectual firepower and made us all more effective advocates."

"I worked with Glen for decades. No one writes a more persuasive brief. Glen has the rare ability to find the needle which is the winning argument in the haystack which is a messy combination of facts and laws."

"Glen is one of the smartest lawyers and best writers with whom I have had the pleasure to work."

"Glen was the colleague whose number I kept on speed dial for when I needed help solving the most difficult legal issues."

"Glen Allen is an exceptionally fine lawyer—he can be relied on as a strong advocate who knows the law and how to use it effectively."

"Glen is at the top of my ranks of respected, able, and effective lawyers."

50.     In 2015-16, Allen participated in the formation of the American Eagle Party. The American Eagle Party welcomed persons of all races, ethnicities, and religions.  Its platform had five basic goals:   End America's involvement in foreign wars and occupations; stop illegal immigration; reclaim Constitutional rights and liberties;  restore America's economy;  and enable media alternatives.  http://www.thepostemail.com/2015/04/23/introducing-the-american-eagle-party-part-1/#comments

51.     In February 2016, Allen met with George Nilson, the Baltimore City Solicitor. Mr. Nilson had been a partner at DLA Piper for many years before becoming City Solicitor and

he and Allen were on cordial terms.  Allen had then, and has today, the greatest admiration for

Mr. Nilson's integrity, creativity,  prowess as an attorney, devotion to the City of Baltimore, and

affability.  As a result of that meeting, Allen agreed to come work for the City of Baltimore Law

Department as an independent contractor at a fraction of the salary he had been earning at DLA

Piper.  One important component of the discussion was that Allen would have a high probability

of succeeding William Phelan as the Chief City Solicitor in charge of appeals upon Mr. Phelan's

retirement, which was anticipated to occur within a year.

52.     Allen began work for the City of Baltimore in February 2016 in the position of

assistant City Solicitor.  He continued working in this capacity until terminated as a result of the

SPLC's August 17, 2016 article.  Allen worked zealously and well for the City.  He received no

complaints and his work was often praised.  Although as an assistant City Solicitor he occupied

the lowest rung on the City Solicitor's echelon of attorneys, he greatly enjoyed the work, as he

was able to work toward the defense and betterment of Baltimore, his adopted city, which he did

with pride and enthusiasm.  He was on cordial terms with his colleagues, worked cooperatively

and respectfully with all of them, played on the City Solicitor's softball team, and participated in

5K runs for charitable purposes with his colleagues, as shown on the following photograph.



53.     One of the cases on which Allen worked, albeit briefly, was *Burgess v. Baltimore*

*Police Department*, a federal case involving multimillion dollar claims against the City of

Baltimore Police Department for wrongful conviction.  Although the only pleading in *Burgess* on

which Allen worked significantly was a motion to bifurcate, which the Court granted,

https://www.leagle.com/decision/infdco20160325g45, he was fully prepared to provide his

competence,  27 years of litigation experience, and zeal within ethical limits on behalf of the

City's defense, and would have done so had the SPLC and Intelligence Project not orchestrated

his firing on August 18, 2016 – partly on the incoherent rationale (discussed in Paragraphs  80-

86) that it was somehow improper that Allen was working for the City on the *Burgess* case at all,

even if he was doing competent and ethical work.  On November 21, 2017, about fifteen months

after Allen's SPLC-orchestrated firing, the City lost the *Burgess* case badly.  A federal jury awarded the plaintiff $15 million, one of the largest verdicts ever awarded in cases of this kind. http://www.baltimoresun.com/news/maryland/crime/bs-md-burgess-verdict-20171121-story.html.

## C.   THE SPLC PARTICIPATED IN THE THEFT
## OF CONFIDENTIAL NATIONAL ALLIANCE DOCUMENTS

54.     Dr. William Pierce, founder of the National Alliance, served as its chairman until his death in 2002.  After his death, Erich Gliebe succeeded him as chairman.  In October 2014, Gliebe resigned and Will Williams became chairman.

55.     Williams, on assuming the position of chairman, was aware that the National Alliance's office building in West Virginia had no National Alliance employee living in or near it to protect and maintain it, and he was generally aware that the National Alliance was in financial and organizational disarray.  Needing an Alliance employee on the property (Williams lived in Tennessee) and also needing a more precise assessment of the Alliance's financial condition, in December 2014 Williams hired Randolph Dilloway, an accountant, pursuant to an employment agreement.  Dilloway was tasked with living on and maintaining the West Virginia property and organizing and assessing the financial and business records on the property.

56.     From the outset of the relationship, Williams made clear to Dilloway that he would be given access to confidential documents that must remain confidential.  Indeed, this fact was obvious.  Moreover, the employment agreement that Dilloway signed contained extensive confidentiality provisions.

57.     The relationship between Williams and Dilloway was marked by accelerating discord during the approximate four months that it existed.  Williams, a decorated Army Special Forces officer in Vietnam, found Dilloway ineffective and insubordinate.

58.   This discord reached a boiling point on May 3, 2015.  On that date, after Williams

had travelled from Tennessee to the West Virginia property to discuss Dilloway's problematic

work performance, Dilloway was aggressive and belligerent toward Williams. When the two

angry men were on the verge of a fistfight, Dilloway noticed that a female National Alliance

employee who was present with Williams at the confrontation had a pistol (which she never

brandished).   Dilloway left the scene hurriedly on foot.  Reaching a house about a mile distant,

he called the local sheriff; meanwhile Williams and the female employee, having determined that

Dilloway had stolen National Alliance property and had been preparing to steal more, had also

called the sheriff.   Dilloway returned to the National Alliance office with two sheriffs, and in the

presence of both of them and a forest ranger who had also arrived on the scene acknowledged

that he had destroyed confidential National Alliance records on a computer with criminal intent.

He was permitted to leave the National Alliance property in an old pickup truck, which he was

allowed to load up with what the sheriffs and Williams assumed were his belongings.  One of the

sheriffs admonished Dillloway to leave and "keep going."

59.   Unknown to Williams, Dilloway had secretly taken with him – had stolen --

numerous thumb drives containing thousands of confidential National Alliance documents that

Dilloway had been surreptitiously and improperly scanning for some time.  These and any other

documents Dilloway stole will sometimes be referred to in this complaint as the "Dilloway

Stolen Documents."

60.   According to a May 20, 2015 article published on the SPLC website by the SPLC's

Intelligence Project entitled "Chaos on the Compound," (described further in Paragraphs 72-75

of this complaint) Dilloway "contacted" the SPLC on May 6, 2015.  That "contact" obviously

included turning over to the SPLC and the Intelligence Project the Dilloway Stolen Documents,

as the May 20 article makes repeated disclosures of and references to confidential National

Alliance documents, including documents protected by attorney client privilege.  The "contact"

involved interstate use of mail or wire services through telephone or internet communications to

coordinate Dilloway's transmission of the Dilloway Stolen Documents to the SPLC and

Intelligence Project in Alabama, plus, in all probability, the transmission of the Dilloway Stolen

Documents to the SPLC and Intelligence Project via the U.S. mail or other interstate carriers.

61.  The Intelligence Project (including Beirich and Potok) and SPLC knew these

documents were stolen.  This fact was obvious.  Moreover, Beirich called Williams shortly

before the May 20 article was published and in that telephone conversation Williams informed

Beirich that the documents had been stolen.  The Intelligence Project (including Beirich and

Potok) and SPLC thus violated the Alabama criminal statute prohibiting receipt of stolen

property, i.e., Section 13A-8-16 of the Alabama Criminal Code:

https://law.justia.com/codes/alabama/2006/13297/13a-8-16.html

62.   The Intelligence Project and SPLC paid Dilloway for the stolen documents. On

information and belief, the amount paid for the stolen documents substantially exceeded $5000.

63.   The Intelligence Project and SPLC thus violated the Alabama criminal statute

prohibiting commercial bribery of a fiduciary, i.e., Section 13A-11-120 of the Alabama Criminal

Code:  https://law.justia.com/codes/alabama/2015/title-13a/chapter-11/article-5/section-13a-11-120/.

64.   The Intelligence Project and SPLC required Dilloway to sign a confidentiality

agreement pursuant to which he was required to keep secret his receipt of payments for the stolen

documents.

65.   The Intelligence Project and SPLC thus not only knowingly received stolen documents but actively participated in and induced the theft by paying for them.

66.   In September 2015, an attorney retained by Williams sent a letter to the SPLC in which the attorney identified the documents Dilloway had taken as stolen and requested their return.  The Intelligence Project and SPLC ignored this letter.

67.   The Intelligence Project and SPLC also ignored a subsequent letter to the same effect from the same attorney.

68.   On information and belief, the Intelligence Project and SPLC have paid not only Dilloway but other members, former members, friends, acquaintances, and spouses or former friends and spouses of members, and supporters or former supporters of the National Alliance for information about the National Alliance.

69.   On information and belief, the Intelligence Project and SPLC have also paid members, former members, friends, acquaintances, and spouses or former former friends, acquaintances, and spouses of members, and supporters or former supporters of other "hate groups" as defined by the SPLC for information.

70.   On information and belief, at least some of the payments described in Paragraphs 68 and 769 are included in the "compensation to disqualified persons" set forth on the SPLC's Form 990s for 2015 and prior and subsequent years.

### D.   THE INTELLIGENCE PROJECT'S MAY 20, 2015 "CHAOS AT THE COMPOUND" ARTICLE VIOLATES CANONS OF LEGAL ETHICS AND IS PERMEATED WITH FALSE STATEMENTS

71.   In an article authored by Beirich and published in the SPLC's Intelligence Project Intelligence Report (of which Potok was the editor in chief) on May 20, 2015, Beirich presented a lurid, self-serving account of Diloway's theft of the confidential National Alliance documents.

The essence of Beirich's and the Intelligence Project's lengthy article was that Dilloway, an accountant, had allegedly "documented" evidence of embezzlement, money laundering, and tax fraud by the National Alliance and had presented this evidence to Will Williams, the Chairman of the National Alliance ("NA"), and to an attorney for the NA, Tim Kalamaros; that Williams and Kalamaros had refused to rectify the alleged wrongdoing; that after Dilloway confronted Williams with evidence of the alleged tax wrongdoing, an altercation ensued on May 3, 2015, which caused Dilloway to run from the NA property fearing for his life; that Dilloway, who had been "[a]ctive in the neo-Nazi, white supremacist scene for more than a decade," nonetheless took this alleged evidence of wrongdoing, i.e., the six thumb drives of documents he had stolen, to the SPLC; that even though Dilloway was subject to a confidentiality agreement and the documents included communications from Kalamaros protected by attorney client privilege, Dilloway, according to Beirich, was nonetheless free to disclose all the documents on the thumb drives, many of which had nothing to do with alleged tax fraud, embezzlement, or money laundering, to the SPLC because Dilloway was supposedly seeking to prevent tax fraud; and that, apparently on the same rationale, the SPLC was free to then disclose the documents to the world.

72.     This narrative is permeated by false and misleading statements and important omissions, including the following:

- As set forth in Paragraph 58 of this complaint, there were two West Virginia deputy sheriffs and one park ranger present at the May 3, 2015 altercation; on information and belief, Dilloway did not mention to these law enforcement officers that he had in his pockets numerous thumb drives containing alleged evidence of NA tax fraud, embezzlement, and money laundering; instead he

remained silent to the sheriffs and park ranger but secretly took this supposed evidence directly to the non-governmental SPLC – this is not credible, unless the Intelligence Project and SPLC encouraged the theft and paid Dilloway for it.

- Further, even assuming *arguendo* that the evidence Dilloway allegedly uncovered might have legally excused his contacting an appropriate government officer despite Dilloway's confidentiality agreement, it did *not* excuse his disclosing the confidential documents to the SPLC, a non-governmental entity.  Dilloway's disclosure to the Intelligence Project and SPLC was an unlawful breach of fiduciary duty, motivated by spite and greed, which the Intelligence Project and SPLC encouraged, aided, abetted, and exploited.

- Moreover, even assuming, again contrary to fact, that Dilloway could have disclosed alleged evidence of alleged NA criminal wrongdoing to the Intelligence Project and SPLC without breaching his confidentiality agreement, Dilloway disclosed to the Intelligence Project and SPLC, and the Intelligence Project and SPLC for their own purposes of fundraising and destroying their political enemies disclosed to the world, information far beyond evidence of alleged criminal wrongdoing  – e.g., the identities of persons who purchased controversial books and the books they purchased – and accordingly the disclosures were nonetheless a breach of the agreement.

- Further, the SPLC, as a purported 501c3 public interest law firm, and its employees, including Beirich and Potok, are subject to canons of legal ethics with regard to their obligations on receiving confidential documents and communications protected by attorney client privilege.   Alabama Rules of

Professional Conduct, to which the SPLC, Beirich, and Potok are subject, provide

as follows:

> **Alabama Rules of Professional Conduct: Transactions with Persons Other Than Clients: Rule 4.4. Respect for Rights of Third Persons**:
>
> > (a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.
> >
> > (b) A lawyer who receives a document that on its face appears to be subject to the attorney-client privilege or otherwise confidential, and who knows or reasonably should know that the document was inadvertently sent, should promptly notify the sender and (1) abide by the reasonable instructions of the sender regarding the disposition of the document; or (2) submit the issue to an appropriate tribunal for a determination of the disposition of the document. http://judicial.alabama.gov/docs/library/rules/cond4_4.pdf;
>
> **Alabama Rules of Professional Conduct: Rule 1.15 Safekeeping Property:**
>
> > (b) Upon receiving funds or other property in which a client or third person has an interest from a source other than the client or the third person, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding that property. http://judicial.alabama.gov/docs/library/rules/cond1_15.pdf

The Rules of Professional Conduct of other states and federal courts are substantially identical.

73.   Berich, Potok, and the SPLC, accordingly, were ethically bound to return

Dilloway's stolen documents to the NA and Kalamaros or, at a minimum, inform Kalamaros and

the NA of the SPLC's receipt of the confidential and privileged documents and either "abide by

[Kalamaros' and the NA's] reasonable instructions" or "submit the issue to an appropriate tribunal." They did none of these things.  Beirich, the Intelligence Project, and the SPLC had no right or authority ex parte, unilaterally, and without notice to deem the confidential documents no longer confidential and the privileged documents no longer privileged and to then use them for their own purposes.

74.     Beirich's, the Intelligence Project's, and the SPLC's purported rationale for revealing the confidential and privileged information was in reality a pretext for their true self-serving aims, i.e., lucrative fundraising and attempting to destroy the NA and anyone connected with it.  On information and belief, an important fact supporting this conclusion is that even though the FBI and IRS were informed of Dilloway's allegations regarding the NA's supposed tax fraud, embezzlement, and money laundering, no charges for any of these alleged crimes, or any other, have ever been filed.  To the contrary, on information and belief the deficiencies in the NA's tax records and reporting (which Mr. Williams has acknowledged existed as a result of the turmoil and disarray at the NA following William Pierce's death in 2002) were worked out with the IRS without so much as a civil levy, and *a fortiori* no tax fraud claims.

75.     The May 20, 2015 "Chaos at the Compound" article supports an inference that the SPLC negligently trained and supervised Beirich and Potok.  More specifically, the following facts and legal principles support this inference:   1) Beirich, the chief of the SPLC's Intelligence Project, was the author of the "Chaos at the Compound" article, including the parts of the article that  evaluate legal questions such as whether Dilloway and the SPLC (including the Intelligence Project) could ethically disclose to the world, and were legally excused from liability for Dilloway's breach of the confidentiality agreement and for the SPLC's and Intelligence Project's disclosure,  of confidential and privileged communications;  2)  for the reasons previously stated,

the rationale presented in the article to purportedly justify Dilloway's and the SPLC's breaches and disclosures was egregiously wrong, and, of equal importance, Beirich should not have made or been involved in making this decision;  3)  on information and belief, Potok, as editor in chief of the Intelligence Project's publications and one of its primary researchers, worked with Beirich on the "Chaos at the Compound" article; and 4) the SPLC,  a purported 501c3 public interest law firm, is obligated to train not only its lawyers but its nonlawyer employees, such as Beirich and Potok, to comply with professional and ethical standards governing lawyers and law firms.

### E.   THE SPLC'S AUGUST 17, 2016 ARTICLE

76.      On or about August 17, 2016, Beirich, the Intelligence Project, and the SPLC widely published an article (the "August 17 Article") that caused Allen to lose his position as an attorney at the Baltimore City Law Department, destroyed his future prospects of employment as an attorney, and ravaged his hard-earned reputation as a competent and ethical attorney. https://www.splcenter.org/hatewatch/2016/08/17/neo-nazi-lawyer-represents-baltimore-suit-over-wrongful-arrest-and-19-year-imprisonment.  Beirich and the SPLC intended all these consequences – indeed, they carefully orchestrated them.

77.      The following are salient points regarding this August 17 Article:

78.      **Beirich, the Intelligence Project, and the SPLC Used Confidential Dilloway Stolen Documents in the Article.**  The article incorporates photographs of, and discusses, the following from among the Dilloway Stolen Documents, all manifestly confidential:

> • A letter dated February 14, 1987 from William Pierce to his attorney, Gerald Domitrovic, Esq., in which Pierce sought legal advice regarding the actions of the local West Virginia sheriff, Jerry Dale, in, *inter alia*, flying over Pierce's property, taking photographs, and providing the photographs to local media. The letter mentioned and cc'd Allen.  This stolen letter, improperly disclosed by Beirich and SPLC to the public to suit Beirich's and the SPLC's aim to destroy Allen, was, to quote Alabama Rule of Professional Conduct 4.4, "a

document that on its face appears to be subject to the attorney-client privilege or otherwise confidential"; Beirich's and the SPLC's use and public disclosure of this document thus violated Rule 4.4, as had their previous use and disclosure of the Kalmaros confidential and privileged documents in Beirich's and the SPLC's May 20, 2015 "Chaos at the Compound" article.

- A receipt for a subscription to "NVM" and a "dues payment" dated November 22, 2002
- A receipt for a "dues Payment" and a "donation" to the National Alliance dated May 6, 2003
- A receipt for a "Jailing Opinions DVD" dated July 11, 2007
- A receipt for attendance at a "Holocaust Revisionist Conference" dated October 1, 2007.

79.     **Beirich's, the Intelligence Project's, and the SPLC's Aims by Means of the Article, Successfully Achieved, Were to Destroy Allen's Vocation and Reputation, Make a Public Example of Him, and Arrogate to Themselves Veto Power in Employee Hiring.**

Although the premise for the SPLC's immensely lucrative tax-exempt 501c3 status is that it is a public service law firm dedicated to an educational mission, its predominant aims, as previously explained, are to destroy organizations and individuals of whom it disapproves ideologically and to limit public discussion of controversial issues such as race, sexual orientation, and immigration.  Consistent with these overarching goals, Beirich's, the Intelligence Project's, and the SPLC's objective by means of the August 17 Article was to destroy Allen's vocation and reputation; to deter others from straying off the reservation, so to speak – i.e., from stepping outside the narrow ideological confines the SPLC presumes to define and permit – by shaming Allen in public; and to achieve veto authority over the hiring decisions of entities such as Baltimore City, or indeed any employer.   Several aspects of the August 17 Article, described below, make these destructive aims manifest.

80.     Beirich, the Intelligence Project, and the SPLC carefully orchestrated a media frenzy about Allen's employment by the City of Baltimore.  Within two days of the publication of the article Allen and his wife were deluged with telephone calls at his home from media as far

away as California and England, not to mention New York, Washington, D.C., and Baltimore, and found Fox Television News Reporters outside their house.  This frenzy did not happen fortuitously;  it was planned and fomented by Beirich, the Intelligence Project, and the SPLC by sending press releases about the article to their media friends and contacts all around America and in other countries. As Laird Wilcox has observed: "Anyone attacked by the SPLC is basically up against a contest of resources, from the ability to engage legal counsel, to access to fairness in media treatment, to the ability to survive the financial destruction of a reputation and career.  What they do is a kind of bullying and stalking.  They pick people who are vulnerable in terms of public opinion and simply destroy them.  Their victims are . . .  up against a very talented and articulate defamation machine."

http://www.thesocialcontract.com/artman2/publish/tsc_20_3/tsc_20_3_wilcox_interview.shtml

      81.     Beirich's, the Intelligence Project's, and the SPLC's rationale for the August 17 Article, to the degree any coherent rationale can even be discerned, is manifestly pretextual.  The article's apparent rationale is that Beirich, the Intelligence Project, and the SPLC, in their wisdom, felt themselves duty bound in the supposed best interests of the City of Baltimore to publicly berate the City and disrupt its operations because the City supposedly had hired a "well known" "Neo-Nazi Lawyer" to work on its cases, particularly the *Burgess* case. But the article harmed, not benefitted, the City; the City lost an experienced attorney (Allen) who was (1) doing competent work (e.g., the only pleading he worked on in the *Burgess* case was a motion to bifurcate, which the Court granted, thereby significantly benefitting the City's legal position) and (2) working harmoniously with his fellow City employees.   Moreover, as a foreseeable consequence of the article the City also lost the services of George Nilson, the City Solicitor, one of the finest and most effective civil servants ever to occupy that office. The SPLC and Beirich,

in contrast to the City (which later suffered a $15,000,000 verdict against it in the *Burgess* case), profited handsomely from the article; they stayed in the news as supposed experts on extremists, which kept donations flowing to the SPLC's already massive bank accounts; they destroyed Allen, who the SPLC assumed had views of which it disapproved; and they destroyed Allen in public, thus creating an *in terrorem* effect dissuading others from adopting, or at least avowing, views on controversial issues such as race that departed from the SPLC's approved views.

82.     The support Beirich, the Intelligence Project, and the SPLC offer in the article for the assertion that Allen is a "well known" "Neo-Nazi Lawyer" is farcical.  Apart from the article's fraudulent characterization of the American Eagle Party, addressed below, the article states:

> "There is more publicly available information on Allen's association with extremists. Allen was publicly identified as the attorney for the National Alliance on the neo-Nazi Vanguard News Network (VNN) forum almost a decade ago, in a post by current NA Chairman Will Williams. The SPLC also reported Allen as the NA's attorney in an article last year."

The article's first purported support is a link to a VNN forum.  On information and belief (Allen was unaware even of the existence of the VNN forum until he saw it mentioned in the SPLC article), the forum posts hundreds of rambling, gossipy, often incoherent posts a week, almost always from anonymous participants with some kind of personal ax to grind.   To assert, as the article has, that one obscure reference to "attorney Glen Allen" buried in one post on a gossipy forum that gets hundreds of posts a month shows that Allen is a "well known Neo-Nazi lawyer" illustrates the depths to which Beirich, the Intelligence Project, and the SPLC stooped to advance their aim of destroying Allen.

83.     Beirich's, the Intelligence Project, and the SPLC's destructive aims are similarly transparent in the August 17 Article's reference to the SPLC's and Intelligence Project's own

prior May 20, 2015 "Chaos at the Compound" article.  There is something circular and

manipulative in the SPLC and Intelligence Project citing their own prior article for the

proposition that Allen is a "well known" "Neo-Nazi lawyer."  In any event,  the lengthy (over ten

pages) May 20, 2015 article that the SPLC and Intelligence Project cite in the August 17, 2016

Article refers to Allen only once, as follows:  "According to a December 2007 post on VNN,

Williams . . . ultimately blamed longtime National Alliance lawyer Glen Allen for siding with

Gliebe at the time."  The May 20 article thus merely cites to the VNN post, which, as mentioned,

is a single phrase buried in single post on a gossipy forum that gets hundreds of posts a month.

84.     Further, after the August 17, 2016 article, the SPLC and Intelligence Project

directly contradicted their earlier pretextual "how dare the City of Baltimore hire a well known

Neo-Nazi lawyer" rationale.   In its 2016 Hate Map, published in 2017, the SPLC and

Intelligence Project featured a photograph of Allen, stating under the photograph, inter alia:

"Hate group members and followers of their ideologies sometimes manage to obtain important

positions of power. When the City of Baltimore recently hired Glen Keith Allen, a neo-Nazi,

*nobody knew of his involvement with white supremacist groups, except for us.*  Because of our

investigation and expose, he was swiftly fired."  (Emphasis added).

file:///Users/glenallen/Downloads/allen%201.pdf.   On information and belief, the SPLC has

published similar statements about Allen before and after the publication of its 2016 Hate Map in

2017.  Thus, when the SPLC's and Intelligence Project's predominant purpose was to embarrass

the City of Baltimore so it would fire Allen and institute new hiring practices under which

persons seeking employment must be subjected to political tests overseen by the SPLC and

Intelligence Project themselves, they characterize Allen as a "well known" "Neo-Nazi" lawyer.

When, however, it later suits their fundraising purposes to boast about their massive surveillance

capabilities, they proclaim that "nobody knew of his involvement with white supremacist groups,

except for us."  The Intelligence Project and the SPLC feel themselves so powerful, in wealth,

reputation, and bullying power, that their actions are beyond challenge and they need not hesitate

to make contradictory and untruthful statements at their whim if doing so suits their purposes.

85.     Finally, the Intelligence Project and SPLC interchangeably describe Allen as an

"attorney for the National Alliance" and as a "Neo-Nazi Lawyer," a smearing technique that

ignores the admonition of legal ethics that lawyers should represent a fair share of unpopular

matters or unpopular clients, especially if no other attorneys will do so.

86.     **The Intelligence Project and SPLC Sought and Achieved Unconstitutional**

**Results by Means of the Article.**   The Intelligence Project and SPLC carefully targeted Allen

for destruction:  "Beirich, head of the intelligence unit at the Southern Poverty Law Center, said

they've watched Allen 'like a hawk.'"

http://www.baltimoresun.com/news/maryland/investigations/bs-md-sun-investigates-hatewatch-

blog-20160820-story.html.  They did so not because he was disruptive at his place of

employment for the City -- he was not;  not because he was **incompetent** as an attorney – even

Beirich acknowledged in her August 17 Article that "Allen may well be a skillful attorney";  but

because he had in Beirich's view "the worst ideas ever created,"

https://www.washingtonpost.com/news/true-crime/wp/2016/08/19/baltimore-fires-city-

government-lawyer-with-seeming-neo-nazi-ties/?utm_term=.e30f38907a9b.

87.     This East Europe Communist thought-crime surveillance mentality is antithetical

to fundamental American cultural and Constitutional principles protecting freedom of expression

and association.  From Madison and Jefferson in the early days of the Republic ("I flatter myself

[I] have in this country extinguished forever the ambitious hope of making laws for the human

mind"), https://blog.lrrc.com/churchstate/historical-materials/madison-letter-to-jefferson-on-the-bill-concerning-religious-freedom-january-22-1786/, through Justices Holmes' and Brandeis' dissents in *Abrams v. United States*, 250 U.S. 616 (1919), to the Supreme Court's decisions in *Brandenburg v. Ohio,* 395 U.S. 444 (1969) and more recently in *Phelps v. Snyder*, 562 U.S. 443 (2011), avatars of the American cultural experiment in free expression have condemned and guarded against the criminalization of mere thought, such as the SPLC effectively enforces.

88.     Governmental employees, such as Allen, do not forfeit these constitutionally protected free speech rights by virtue of accepting government employment.   *See, e.g., Rankin v McPherson*, 483 U.S. 378, 383 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." );  *Heffernan v. City of Paterson, New Jersey*, 578 U.S. ---- (2016).   Moreover, a governmental entity may not retaliate against an independent contractor or a regular provider of services for the exercise of freedom of speech. *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996) (reaffirming that a "State may not condition public employment on an employee's exercise of his or her First Amendment rights" and holding that there is no distinction between employees and independent contractors in this regard).

89.     **The Intelligence Project and SPLC Employed False Statements and Implications in the August 17 Article**.  Prominent among the false statements and implications in the August 17 Article were those concerning the American Eagle Party ("AEP"). The article's assertion that the AEP is "racist" is false. As noted previously, there were no racial elements in the AEP's platform or membership criteria. During its brief existence it was open to persons of all races, religions, and sexual orientation.  In fact, Merlin Miller, the West Point graduate and film director who founded the AEP, resigned from a prior party because of that party's racial

elements.  Miller had previously produced and directed the film *Jericho*, which features an

African-American in a major and positive role and has an anti-discrimination theme.

90.     Part of the AEP's aims was to widen the national debate – to make it more

inclusive and more civil -- on controversial topics.  To that end, Allen and Miller explored the

concept of an AEP affiliate that would present a forum for open but civil discussion on

controversial issues, with an aim to present both sides of the debate.  In this spirit, unrehearsed

and half in jest, Allen went through a rough experimental "first take" on broadening the debate

on vaccination.  The implication in the August 17 Article that Allen or Miller posted this rough,

unrehearsed first take on Storm Front is false.  Neither Allen nor Miller did so, and neither even

knows how the rough first take came to be posted there. In any event, advocating widening

debate on vaccination, or indeed any topic, is not "hate" wherever it is presented, even though

Beirich attempts to portray it in this manner.  Inclusion of the vaccination rough take in the

August 17 Article in reality accomplished several goals for the Intelligence Project and SPLC:

1) it made Allen look ridiculous; 2)  it "linked"  him to Storm Front;  and 3) it sent the message

to Allen and others:  "We are watching everything you do, all the time."

91.     The August 17 Article's lengthy discussion of the *Burgess* litigation and obvious

sympathy for Burgess implies that Allen had acted, or would act, unethically and improperly

with regard to that litigation.  Allen, however, did nothing other than represent his client, the City

of Baltimore, zealously and competently and in full compliance with his ethical obligations with

regard to the *Burgess* case and all other cases on which he worked. The article's implication to

the contrary is false.

92.     **Beirich, the Intelligence Project, and SPLC Deliberately Omitted Highly**

**Relevant Facts About Allen from the August 17 Article that Would Have Contributed to a**

**Less One-Sided and Demonizing Portrait of Allen.**  Laird Wilcox, a critic of the ritual

defamation practiced by the SPLC and others, has observed:

> In order for a ritual defamation to be effective, the victim must be dehumanized to
> the extent that he becomes identical with the offending attitude, opinion, or belief,
> and in a manner which distorts it to the point where it appears at its most extreme..
> . . .
> The power of ritual defamation lies entirely in its capacity to intimidate and
> terrorize. It embraces some elements of primitive superstitious belief, as in a
> "curse" or "hex.". . . .
> It is important to recognize and identify the patterns of a ritual defamation. Like all
> propaganda and disinformation campaigns, it is accomplished primarily through
> the manipulation of words and symbols.  It is not used to persuade, but to punish.
> Although it may have cognitive elements, its thrust is primarily emotional. Ritual
> defamation is used to hurt, to intimidate, to destroy, and to persecute, and to avoid
> the dialogue, debate, and discussion upon which a free society depends. On those
> grounds it must be opposed no matter who tries to justify its use.
> http://catholicism.org/big-expose-of-the-southern-poverty-law-center.html
> (Article entitled "The Practice of Ritual Defamation").

93.    Beirich's, the Intelligence Project's, and SPLC's August 17 Article, in accord with

the blueprint Wilcox describes, achieved its goal of dehumanizing Allen by omitting any facts

suggesting that Allen, although a fallible human being who has made mistakes, has redeemable

qualities.  It may be objected that the SPLC (including the Intelligence Project) has no obligation

to present even the semblance of balance in its articles;  like a supermarket tabloid such as the

National Inquirer, this objection might contend, the SPLC is free to present as one-sided,

exaggerated, sensationalistic a description as it chooses.  Such an objection, however, overlooks

the fact that the SPLC is not a for-profit newspaper such as the National Inquirer;  it is a 501c3

nonprofit that has received favored and lucrative  tax-exempt status based on the premise it is a

public service law firm with an educational mission.  The concept of "education" and the

privilege of tax exemption impose some degree of obligation for fair balance in its articles.  See

26 C.F.R. Section 1.501(c)(3) – 1(d)(3)(b) ("An organization may be educational even though it

advocates a particular position or viewpoint so long as it presents a sufficiently full and fair

exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion.") https://www.law.cornell.edu/cfr/text/26/1.501%28c%29%283%29-1;  Rev. Proc. 86-43, 1986-2 C.B. 729 ("The presence of any of the following factors in the presentations made by an organization is indicative that the method used by the organization to advocate its viewpoints or positions is not educational. (1) The presentation of viewpoints or positions unsupported by facts is a significant portion of the organization's communications. (2) The facts that purport to support the viewpoints or positions are distorted. (3) The organization's presentations make substantial use of inflammatory and disparaging terms and express conclusions more on the basis of strong emotional feelings than of objective evaluations.") https://www.irs.gov/pub/irs-tege/rp_1986-43.pdf.

94.     Among the destructive, one-sided, distorting aspects of the August 17 Article are the following:

- The article omits any reference to the abundant *pro bono* work Allen has done for African-Americans and others, as detailed in Paragraphs 47 and 48.  Beirich, the Intelligence Project,  and SPLC can hardly claim they were unaware of Allen's *pro bono* work.  Beirich has boasted publicly that she was "watching [Allen] like a hawk"; Beirich, the Intelligence Project, and SPLC conducted surveillance on every aspect of the American Eagle Party, a minuscule political party that existed only a short time;  Beirich, the Intelligence Project, and SPLC found one allusion to Allen buried in one post among (on information and belief) hundreds of posts a week on a forum called the VNN forum, evidence that Beirich, the Intelligence Project, and SPLC have dedicated enormous manpower and resources to reading and keeping databases from dozens of chat rooms and forums;  and Beirich, the

Intelligence Project, and SPLC combed through  pleadings to find Allen

mentioned as one of nearly a dozen attorneys involved in the *Burgess* litigation.

Given Beirich's, the Intelligence Project's, and the SPLC's gigantic budget, their

public statements, and their manifestly large and aggressive surveillance

operations, it is hardly credible that they were unaware of Allen's *pro bono* work

in the *Unger / Waine* matter, a headline-making case in which Allen's name

appeared on an important *amicus* brief filed in the Maryland Court of Appeals, or

the *Stowers / Lloyd* matter, in which the federal court commended Allen in a

memorandum opinion;   moreover, they could easily have learned of Allen's other

*pro bono* activities, such as mentoring D'Andre Johnson for four years, from a

single call to his former law firm.  Beirich, the Intelligence Project, and SPLC,

however, were uninterested in any aspects of Allen's life except those they could

use to destroy his vocation and reputation and make a public *in terrorem* example

out of him.

- The article discusses Merlin's Miller's statements at a press conference in Iran

  regarding a possible Mossad role in the 9 /11 attacks, but omits the larger purpose

  of Miller's visit to Iran:  to open channels of communication and friendship with

  an Islamic country in the context of escalating calls for military conflict between

  Iran and the United States.  The article falsely portrays Miller as a hater when in

  fact he was a peacemaker.

### F.  HARMS TO ALLEN FROM THE AUGUST 17, 2016 ARTICLE

95.     The damages caused to Allen by the August 17 Article were immediate,

devastating, and long lasting.

96.     The article caused Allen's immediate termination from his employment at the City of Baltimore's law department.  Beirich, the Intelligence Project, and SPLC have publicly boasted that Allen's termination was a result they caused and intended to cause by the article.

97.     At the date of his termination, Allen was an independent contractor attorney for the City earning approximately $90,000 a year.  He was performing his job duties competently and working harmoniously with his co-workers and supervisors.  He had excellent prospects for securing a permanent position at the City Law Department within a year at a salary of $105,000 or more.

98.     Allen was in good health, physically and mentally.  He had recently set the Maryland State Senior Olympic record for the 400 meter dash for his age group and was ranked fourth in the world for the pentathlon for his age group.  He planned to work another ten years for the City and would have done so but for the article.

99.     The article gravely damaged Allen in his vocation as an attorney specializing in trial and appellate litigation:

- Not only was Allen permanently branded as a "Neo-Nazi Lawyer" based on the Dilloway Stolen documents, but any attempt by him to gain employment from any governmental or private entity became subject to Beirich's, the Intelligence Project's, and SPLC's repetition of its ritual public shaming;  Allen, at Beirich's, the Intelligence Project's, and SPLC's caprice, would be subjected again to a similar devastating public attack;

- Allen could not in good faith fail to inform potential clients or employers of the article and the threat of a new and similar article, which enormously complicates

Allen's attempt to create a good working relationship with his clients or

employers and gain their trust;

- The widespread, sensationalistic, and unending publicity from the article, which

    remains on the SPLC's and Intelligence Project's website, carries with it the

    potential to taint Allen's effectiveness before judges and jurors, who may feel

    animosity toward him (even if not acknowledged) based on the SPLC's and

    Intelligence Project's characterization and let this anger affect their treatment of

    his clients.

100.    The article's horrific impact on Allen's reputation is exemplified by his former

law firm's immediate withdrawal of the glowing testimonials that members of the firm had

previously provided for Allen and he had posted on his website, as described in Paragraph 50 of

this complaint.  Within a day of the publication of the article, the firm called Allen to request that

the testimonials be removed from the website, which Allen did.

### G.  THE SPLC'S AND INTELLIGENCE PROJECT'S "HATE MAPS" AND LISTS OF "HATE GROUPS," "ANTI-LGBT EXTREMISTS," AND "ANTI-MUSLIM EXTREMISTS" ARE PERMEATED WITH FRAUD

101.    The SPLC and the Intelligence Project have published "hate maps" and lists of

"hate groups" for several decades, and lists of "anti-LGBT extremists" and "anti-Muslim

extremists," on information and belief, for several years.  Numerous observers (and victims) of

these publications have presented well-grounded factual predicates, adopted in this complaint,

for concluding that the publications contain deliberately misleading or inaccurate statements.

102.    **The SPLC and Intelligence Project Intentionally Inflate "Hate Group"**

**Tallies**.  The SPLC's and Intelligence Project's calculations of the number of active "hate

groups" in the U.S. on its annual "hate maps," including the "hate map" it mailed around the

United States in 2017, have been repeatedly false and fraudulent.  Many critics have criticized these numbers as intentionally inflated.  *See, e.g.*, Harry Zieve Cohen, "An Anti-Hate Group that Jumped the Shark," The Hudson Institute (March 6, 2017) https://www.hudson.org/research/13419-an-anti-hate-group-that-jumped-the-shark ("This year [2017, the SPLC] identified a three-fold increase in anti-Muslim hate groups by changing its accounting rules. Act for America, a 500,000-strong legislative advocacy organization whose classification as a hate group was already questionable, was suddenly counted 45 times, once each for 45 of its 1000 local chapters. Such shoddy work makes it no wonder that FBI hate crime investigators officially stopped relying on the SPLC's analysis in 2014."); J.M. Berger, "The Hate List," (March 12, 2013) http://foreignpolicy.com/2013/03/12/the-hate-list/ ("Reasonable people can debate these reasons for including or disqualifying each of these listings, but the number of entries that require such debate is staggering given the specificity of the SPLC's reporting. We're not talking about a difference of 5 or 10 percent in the relative counts; it's 65 or 70 percent."); Richard Keefe, Watching the Watchdogs, (March 9, 2014): https://rkeefe57.wordpress.com/2014/03/09/splc-2014-the-hate-group-bubble-pops/;  Richard Keefe, Watching the Watchdogs (April  2015): https://rkeefe57.wordpress.com/2015/04/; Richard Keefe, Watching the Watchdogs (March 2016) ("SPLC Hate Map 2016 – Incredible . . . Literally") https://rkeefe57.wordpress.com/2016/03/.

103.     A specific instance of the SPLC and the Intelligence Project fraudulently cooking the books in their "hate group" tallies is their designation of 40 "hate groups" in New Jersey (the third highest number for any state) in their 2014 "Hate Map," published in February 2105.  A New Jersey newspaper reporter, investigating the claim, contacted Mark Pitcavage, Director of Research at the Anti Defamation League, who stated (as paraphrased in the newspaper article):

"[T]he SPLC has a habit of counting single individuals as groups or chapters, which can give a skewed impression of hate groups in any given state." And further (quoting Pitcavage): "The Southern Poverty Law Center's list is wildly inflated . . . They list skinhead groups in places where there are no organized groups, but instead it's just a couple of individuals." Jason Laday, The South Jersey News (March 5, 2015):

http://www.nj.com/south/index.ssf/2015/03/new_jersey_has_fourth_highest_number_of_hate_group.html;  Richard Keefe, Watching the Watchdogs (April 2, 2015):

https://rkeefe57.wordpress.com/2015/04/02/anti-defamation-league-outs-splc-hate-map/.

104.    **The SPLC Uses an Amorphous, Self-Serving Definition of "Hate Group" at Odds with Its Widely-Accepted Connotation**.  The usual, widely-accepted connotation of "hate group," especially an "active" "hate group," includes a primary purpose of inciting or promoting hostility against another group.  The Federal Bureau of Investigation's definition of "hate group" reflects this common understanding: "Hate Group–An organization whose primary purpose is to promote animosity, hostility, and malice against persons of or with a race, religion, disability, sexual orientation, ethnicity, gender, or gender identity which differs from that of the members or the organization, e.g., the Ku Klux Klan, American Nazi Party."  See Criminal Justice Information Services Division Uniform Crime Reporting Program Hate Crime Data Collection Guidelines and Training Manual (2/27/2015) at page 9:  https://ucr.fbi.gov/hate-crime-data-collection-guidelines-and-training-manual.pdf.    Moreover, given that "hate groups" are closely associated in the common understanding with "hate crimes," the connotation of "hate group" includes a proclivity for, if not active participation in, violence and intimidation.  See the FBI's definition of "hate crime": "A hate crime is a traditional offense like murder, arson, or

vandalism with an added element of bias." https://www.fbi.gov/investigate/civil-rights/hate-crimes

105.    The SPLC itself emphasizes this link between "hate groups" and violence; in bold letters at the top of its 2016 "hate map" it states:  "Hate and antigovernment extremist groups continue to operate at alarming levels in the U.S. – fomenting racist violence, seeking to poison our democracy, and, in some instances, plotting domestic terrorist attacks."

106.    It is, accordingly, false – and outrageous – for the SPLC to smear as "hate groups" conservative Christian groups that on no fair and objective interpretation could properly be so stigmatized.  The SPLC will assert that it is free to define "hate groups" as it wishes, to advance its own agenda. There are two – at least two -- flagrant flaws in such an assertion.  First, allowing the SPLC to define "hate groups" to suit its own purposes ignores the reality that the usual connotation of "hate group" continues to resonate at a deep emotional level with the general public and consequently continues to inflict grave harm on organizations branded with this label.  https://www.washingtontimes.com/news/2017/sep/5/southern-poverty-law-hate-map-listing-costly-ruth-/: ("Being classified as a 'hate group' by the Southern Poverty Law Center has been costly for the Ruth Institute, a Catholic nonprofit dedicated to combating the breakdown of the family. First, the online retail giant Amazon refused to allow the group to be included on its Amazon Smile charitable giving program. Then, last week, Vanco Payment Solutions dropped the ministry from its online donation processing service.")  Second, the SPLC's definition, which speaks of groups that "attack" a selective list of other groups, is cunningly equivocal.   Given this equivocal "attack" language and (1) the SPLC's practice of explicitly accusing the "hate groups" it identifies of "fomenting racial violence," and (2) the SPLC's prominent inclusion of the KKK on its "hate group" lists, the SPLC's purported redefinition is shown to be a transparent ploy to

give the SPLC cover to destroy nonviolent groups who fail to adhere to the SPLC's political agenda.

107.    The inclusion of The Ruth Institute, a conservative Catholic organization, on the list of "hate groups" on the SPLC's 2017 "hate map" published across the United States and sent to organizations such as Guidestar USA and AmazonSmile Foundation, Inc., is representative of the fraud that permeates the SPLC's "hate map" and "hate group" lists.  Although The Ruth Institute has made statements critical of homosexuality, it is a Christian organization for which hatred is antithetical to its Christian values.

108.    Jennifer Roback Morse, President of the Ruth Institute, has made clear that it has never practiced, threatened, or condoned violence or intimidation against other groups.

http://www.washingtontimes.com/news/2017/sep/5/southern-poverty-law-hate-map-listing-costly-ruth-/ ("We don't incite anybody to violence. We don't say we hate anybody. We don't demean anybody," said Ms. Morse.  "We disagree with certain policy positions that are being aggressively promoted by professional gay rights organizations. But we disagree with their policies. That's all.")

109.    **The Intelligence Project and SPLC Published False Statements Regarding Maajid Nawaz.**  Maajid Nawaz is British of Pakistani origin.  He is the author of *Radical,* a book published in 2013, which recounts his journey into and out of Islamist extremism.  Through Quilliam, an organization he created, and in other ways he has worked to counter extremism of all types, but particularly Islamist extremism, by encouraging civil discussion, education, and other nonviolent means. His activism has included such courageous actions as travelling to Pakistan to show open support for Malala Yousafzai, the young girl whom Taliban gunmen shot in the head and attempted to murder for her activism in promoting female education in Pakistan.

110.     It was, accordingly, astounding for Nawaz, who remains a reformist liberal Muslim, to discover himself on the SPLC's list of "anti-Muslim extremists," a list prominently displayed on the SPLC's website in 2016 that was propagated all around the world,  endangering his life.   It is true Nawaz has been critical of his own Muslim religion in many respects, but it is also true he has defended Islam as essentially a religion of peace, for example in debates against Ayaan Hirsi Ali, a Somali-born former Muslim and activist who survived female genital mutilation and a forced marriage but who has also been listed by the SPLC as an "anti-Muslim extremist."  *See, e. g.,* http://www.answersininsanity.com/2015/11/muslims-fail-to-prove-islam-is-a-religion-of-peace-in-debate/#!/; see also http://nypost.com/2017/06/30/the-tolerant-left-has-no-problem-bashing-those-who-speak-out-against-muslim-extremists/.   In any event, it was presumptuous in the extreme for the SPLC to smear Nawaz as an "anti-Muslim extremist," and implicitly link him to "hate speech," for his nonviolent criticisms and attempts to liberalize and reform his own religion.  See, e.g., https://www.quilliaminternational.com/maajid-nawaz-speaks-about-journey-from-extremism-to-democratic-awakening/   ("After leaving my Islamist group, I decided many young Muslim minds desperately needed help in moving away from totalitarian worldviews, and towards more constructive and inclusive dialogue. Quilliam was founded to act as an intellectual hub and centre of gravity for former Islamists like myself to use as a platform to start encouraging a more critical and progressive attitude in the Muslim way of thinking, [which] had come to be dominated by Islamism.").

111.     As in so many other instances of SPLC "hate" and "extremist" labeling, Beirich was at the forefront of the attack on Nawaz, falsely claiming that he asserted that all Muslims were potential terrorists and that he advocates that all Mosques be surveilled. https://www.youtube.com/watch?v=q1e7MiAsS8A.  The SPLC's also falsely stated that Nawaz

advocates a blanket ban on wearing of Muslin veils, or niqabs.  https://www.yout
ube.com/watch?v=Rua8ySta6Nc.  The SPLC further included in supposed support of its smear
of Nawaz the alleged fact that he attended a bachelor party at a nightclub.
https://www.youtube.com/watch?v=Y3w4ZDJ39n4.  Even assuming this allegation to be true,
such an assumed fact has no bearing on whether Nawaz could properly be characterized as an
anti-Muslim extremist.   This is another instance of the SPLC's method of destroying by personal
attacks and tabloid scandal-mongering those persons and organizations the SPLC has determined
have crossed the lines of permissible speech it has drawn.

112.   The SPLC's scurrilous thought control campaigns sometimes misfire, and its smear
campaign against Nawaz did in this instance.  Nawaz fought back.  Finding the SPLC's
characterization outrageous and several of its statements in purported support of the
characterization false and disparaging, Nawaz announced his intention to sue the SPLC for
defamation.  The SPLC then, in the words of one commentator, "caved spectacularly."
https://www.nationalreview.com/magazine/2018/09/10/southern-poverty-law-center-essentially-
a-fraud/.  It admitted it had made errors, acknowledged it had not done adequate research,
deleted its anti-Muslim extremist list, publicly apologized to Nawaz, and paid him $3.3 million
in settlement.  *Id.*  This illustrates the SPLC's modus operandi:  smear recklessly;  fundraise off
the smear;  then, if forced to – but only if forced to – investigate the facts.

**H.   THE SPLC'S AND INTELLIGENCE PROJECT'S FEBRUARY 2017 "HATE MAP" FALSELY
ACCUSES ALLEN OF "INFILTRATING" THE BALTIMORE CITY LAW DEPARTMENT.**

113.   The "SPLC "Hate Map" published in 2017 all across the United States
prominently displays Allen's photograph next to the caption in bold red:  "EXPOSING
RACISTS WHO INFILITRATE PUBLIC INSTITUTIONS."
file:///Users/glenallen/Downloads/allen%201.pdf.  Under this caption, the SPLC "Hate Map"

states:  "Hate group members and followers of their ideologies sometimes manage to obtain important positions of power. When the City of Baltimore recently hired Glen Keith Allen, a neo-Nazi, nobody knew of his involvement with white supremacist groups, except for us. Because of our investigation and expose, he was swiftly fired."  Thus, the SPLC publicly claims Allen "infiltrated" the City of Baltimore law department with "racist" and "neo-Nazi" policies, which the SPLC put a stop to by causing his firing.

114.    The Merriam-Webster dictionary defines "infiltrate" as follows:  "to enter or become established gradually or unobtrusively usually for subversive purposes, e.g., 'the intelligence staff has been infiltrated by spies.'"   The Collins Dictionary defines it as follows: "to penetrate or cause to penetrate (a region or group) gradually or stealthily, so as to attack or seize control from within."  The Dictionary.com definition is as follows: "to pass a small number of (soldiers, spies, or the like) into a territory or organization clandestinely and with hostile or subversive intent."

115.    Allen did not "infiltrate" the Baltimore City Law Department in accordance with these or any other widely accepted definitions.   He did not enter into it secretly or clandestinely with hostile or subversive intent so as to attack it or seize control of it from within.  Such a claim is ridiculous.  He was hired openly and in accordance with normal procedures by the City Solicitor, George Nilson, an active and prominent liberal Democrat, who had known him for decades while both worked at DLA Piper;  while in the City Law Department, Allen was not in a policy-making position, never let political  issues influence his legal work, and in fact never even talked politics at the office.  He remained loyal to his professional and ethical obligations to represent his client, the City of Baltimore, a city primarily composed of African-American residents and with an African-American mayor and primarily African-American city council,

zealously and competently.  The SPLC smear, from which it profited handsomely, essentially

accuses Allen of professional ethical violations and incompetence, for which the SPLC had no

evidence because it was not true.  It was a knowingly false statement that the SPLC published

through the U.S. Mails all across the USA.  It further damaged Allen's reputation as an attorney.

**I.    THE SPLC IMPROPERLY PARTICIPATED IN PARTISAN
POLITICAL CAMPAIGN ACTIVITIES IN THE 2016 ELECTION CYCLE**

116.    As previously noted, the SPLC, like other 501c3 tax exempt organizations, is

subject to the general prohibition against participating or intervening in (including the publishing

or distributing of statements) "any political campaign on behalf of or in opposition to any

candidate for public office."  26 CFR 1.501(c)(3) – 1 (c)(3)(iii);

https://www.law.cornell.edu/cfr/text/26/1.501%28c%29%283%29-1. The SPLC has violated this

prohibition flagrantly and repeatedly.   During the period from October 2015 until November

2016, the SPLC on over a hundred occasions publicly attacked the characters and policies of the

prospective Republican (and only the Republican) candidates for President, including Ted Cruz,

Ben Carson, and, above all, Donald Trump.   A few examples:

- The SPLC's  February 17, 2016 Intelligence Report to which Beirich contributed
  contained an article captioned "Candidates for President, Other Offices, Voice
  Extremist Views."  The article condemned "extremist views" attributed to five
  presidential candidates – Trump, Carson, Cruz, Huckabee, and Rubio – all
  Republicans.  The SPLC commented "It's hard to say which [Republican]
  candidate's rhetoric is most appalling."  The report also stated, among numerous
  other unlawful and negative partisan political attacks, that "[F]rom start to finish,
  the year 2015 was remarkable for . . . the boost far-right ideas and groups received
  from pandering politicians like Donald Trump."

- In an April 13, 2016 SPLC Teaching Tolerance Report titled "The Trump Effect:
  The Impact of the Presidential Campaign on our Nation's Schools," the SPLC
  mentioned Hillary Clinton only once, but Donald Trump 27 times, always in a
  highly negative light.

- On February 28, 2016 Beirich on behalf of the SPLC published numerous
  statements disparaging Trump and his assumed "ideas," including: "Donald

Trump's statements this morning are just the latest in a string of incidents where he has used his massive media presence . . . to elevate extremist ideas and individuals."

- In a letter complaint that the Federation for American Immigration Reform ("FAIR") filed with the Internal Revenue Service on April 4, 2017, FAIR identified over 113 instances in which the SPLC engaged in partisan political campaigning in the 2016 Presidential elections against announced candidates, all Republicans, primarily Donald Trump, and this tally was only through July 2016. https://fairus.org/sites/default/files/2017-08/SPLC_Complaint.pdf.

- *See also, e.g.,* Stella Morabito, *The Federalist* (May 17, 2017), *Twelve Ways the Southern Poverty Law Center Is a Scam to Profit from Hate-Mongering*, at Section 6: "The SPLC operates far more as a political action committee than as the nonprofit it claims to be. The hyper-partisan nature of the SPLC's operations makes its nonprofit status seem like a joke." http://thefederalist.com/2017/05/17/12-ways-southern-poverty-law-center-scam-profit-hate-mongering/

- *See also, e.g.,* Karl Zinsmeister, *Philanthropy Today* (Spring 2017), describing the SPLC as a "notoriously partisan attack group" with an "utter lack of reasonable criteria for who goes on its list" [of hate groups]. https://www.philanthropyroundtable.org/philanthropy-magazine/article/spring-2017-briefly-noted.

117.    In an IRS Form 990 Return of Organization Exempt from Income Tax that the SPLC filed via the U.S. mails or electronically with the Internal Revenue Service on or about January 26, 2017 (when it was signed), covering the SPLC's fiscal year November 1, 2015 to October 31, 2016, the SPLC stated under penalties of perjury that it did not "engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office." https://www.splcenter.org/sites/default/files/990_103116.pdf.  As shown above, this was a knowingly false statement.

## J.    THE SPLC HAS ENGAGED IN UNETHICAL ACTIONS PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE.

118.    Among a myriad of other instances of violating legal ethics, the law, and civilized norms, the SPLC has engaged in conduct prejudicial to the administration of justice by

submitting documents before a judicial tribunal replete with smears, name-calling, and invective, its favored approach and one at which it is masterful.  In 2015, when FAIR submitted an amicus brief on an immigration issue, the SPLC opposed the amicus brief not with legal argument but with smears and name-calling, as described by the United States Department of Justice's Disciplinary Counsel in a March 2016 letter ruling:

> "Based on the foregoing information, this office is troubled by the conduct of . . . Ms. Cho [lawyer for the SPLC] . . . [Her] conduct overstepped the bounds of zealous advocacy and was unprofessional.  In [her] motion[ ] . . . Ms. Cho  . . . made uncivil comments that disparaged FAIR and its staff . . . Ms. Cho  . . .  called FAIR a 'hate group,' 'anti-immigrant,' 'white supremacist,' 'eugenicist,' 'anti-semitic,' and 'anti-Catholic.'  None of this language was related or relevant to the underlying legal or factual issues or FAIR's amicus briefs, and its sole purpose was to denigrate FAIR and its staff.  Such language is not appropriate in a filing before the Board (or any judicial tribunal) because it constituted frivolous behavior and does not aid the administration of justice."  Department of Justice Disciplinary Counsel Letter Dated March 28, 2016 at page 3: http://immigrationreformlawinstitute.org/Docs/EOIRDecision.pdf

119.    At the top of the SPLC's 2016 "Hate Map," published in 2017, the SPLC states: "The Southern Poverty Law Center is the nation's leading source for reliable analysis of the radical right.  Hate and antigovernment extremist groups continue to operate at alarming levels in the U.S. – fomenting racist violence, seeking to poison our democracy, and, in some instances, plotting domestic terrorist attacks."  file:///Users/glenallen/Downloads/allen%201.pdf.   The SPLC's representation that it is "the nation's leading source for reliable analysis of the radical right" is false and misleading.  Among other reasons it is false and misleading are the following, which have been previously explained:

- The SPLC uses illegal means to obtain information;

- The SPLC violates canons of professional ethics;

- The SPLC uses a self-serving redefinition of "hate groups" that is inconsistent with the usual and widely accepted meaning;

- The SPLC wildly inflates the number of "hate groups" on its "hate maps";

- The SPLC violates the prohibition of 501c3 organizations participating in political activity against a candidate;

- The SPLC engages in tabloid-style journalism and personal attacks that lack even the semblance of objectivity or balance;

- The SPLC tailors its communications for maximum fundraising purposes.

### K.   THE SPLC HAS PROVIDED SLANTED
### INFORMATION TO THE FEDERAL BUREAU OF INVESTIGATION

120.    On information and belief, the SPLC provided biased information to the Federal

Bureau of Investigation and other law enforcement organizations for many years up to and

including 2014, and may have continued to do so after 2014.   See

http://www.foxnews.com/politics/2018/07/28/gop-lawmaker-wants-answers-on-fbis-alleged-southern-poverty-law-center-ties.html (Congressman Matt Gaetz's July 23, 2018 letter to the FBI

demanding answers to questions regarding information shared between the FBI and the SPLC).

### E.  CAUSES OF ACTION

### COUNT I

### (DECLARATORY JUDGMENT CLAIM AGAINST SPLC)

121.    Allen incorporates the allegations set forth in Paragraphs 1 through 120.

122.    The SPLC's status as an assumed 501c3 public interest law firm has contributed

and continues to contribute greatly to its ability to accomplish its goals of conducting close

surveillance on and destroying Allen and others, in that this 501c3 status facilitates the SPLC's

access to media, imparts to the SPLC the undeserved status of a respectable civil rights

organization, enhances donations to its already massive operating funds and net assets, and

contributes to a general willingness among the public to ignore or excuse the SPLC's violations

of the rights of free expression and freedom of association of its victims.

123.    Allen has been directly injured by the SPLC's abuse of its 501c3 status.  Among

other things, the SPLC's assumed 501c3 status facilitated its ability to generate massive publicity

relating to the SPLC's August 17, 2016 article and thus to successfully pressure the City of

Baltimore to fire Allen.  The SPLC's assumed 501c3 status has also enhanced its ability to reach

wide audiences with its false characterization of Allen as "infiltrating" the City of Baltimore Law

Department in its 2016 "Hate Map."

124.    Under Internal Revenue Service Code 4.76.9.3, which defines the Public Interest

Criteria a public service law firm must adhere to to receive or maintain 501c3 tax status:

> 2.   The organization can not attempt to achieve its objectives by illegal activity
>      or through a program of disruption of the judicial system.

> 3.   The organization can not violate any canons of legal ethics.

125.    Allen asserts that the SPLC has contravened and violated the Public Interest

Criteria for 501c3 status described in the prior paragraph by, among other violations, those

summarized in Paragraph 24 of this Complaint, including:   knowingly receiving stolen property,

namely the Dilloway Stolen Documents;  participating in the theft of the Dilloway Stolen

Documents by paying for them or otherwise benefitting Dilloway; multiple instances of mail and

wire fraud; menacing with a shotgun; making a false statement on its IRS Form 990; violating

attorney client privilege; engaging in conduct prejudicial to the administration of justice; and

violating Rules of Professional Conduct 1.2(b), 1.15(b), 4.1(a), 4.2(a), 4.4(a), 4.4(b), 5.3, 6.2,

8.4(b), 8.4(c), and 8.4(d).

126.    The SPLC disputes Allen's assertions in the prior paragraph.  An actual and

concrete dispute as to this issue, therefore, exists between the parties.

127.    The SPLC's 501c3 status is also based on the requirement that it has not engaged in partisan political campaigning.  As set forth in Paragraphs 25, 117, and 118 of this complaint, Allen asserts that the SPLC has repeatedly and flagrantly contravened and violated this requirement.

128.    The SPLC disputes Allen's assertions in the prior paragraph.  An actual and concrete dispute as to this issue, therefore, exists between the parties.

129.    The SPLC's 501c3 status is also based on the requirement that its actions remain within its educational mission.  As set forth in Paragraph 94 of this complaint, the concept of "education" and the privilege of tax exemption impose some degree of obligation for fair balance in its articles.  See 26 C.F.R. Section 1.501(c)(3) – 1(d)(3)(b) ("An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion.") https://www.law.cornell.edu/cfr/text/26/1.501%28c%29%283%29-1;  Rev. Proc. 86-43, 1986-2 C.B. 729 ("The presence of any of the following factors in the presentations made by an organization is indicative that the method used by the organization to advocate its viewpoints or positions is not educational. (1) The presentation of viewpoints or positions unsupported by facts is a significant portion of the organization's communications. (2) The facts that purport to support the viewpoints or positions are distorted. (3) The organization's presentations make substantial use of inflammatory and disparaging terms and express conclusions more on the basis of strong emotional feelings than of objective evaluations.") https://www.irs.gov/pub/irs-tege/rp_1986-43.pdf.

130.    Allen asserts that the following aspects of the SPLC's conduct with respect to him and others contravene and violate the SPLC's required educational mission:  its avowed purpose of destroying entities and persons it describes or monitors as so-called hate groups or hateful persons;  its practice of ritual defamation;  its disregard of even a semblance of balance in its August 17, 2016 article about Allen and in other articles it has published about other entities and persons it describes or monitors as so-called hate groups,  hateful persons, or extremists;  its tactics of orchestrating violations of the constitutional rights of Allen and other entities and persons it describes or monitors as so-called hate groups or hateful persons;  its manifest primary focus on fundraising, which, among aspects, leads it to adopt sensationalist supermarket tabloid style journalism;  and its massive surveillance operations, which include a multitude of informants and spies.

131.    The SPLC disputes Allen's assertions in the prior paragraph.  An actual and concrete dispute as to this issue, therefore, exists between the parties.

132.    A declaratory judgment stating that the SPLC's improper and illegal actions as set forth above contravene and violate requirements for its 501c3 status will serve the useful purpose of clarifying the legal relations between the SPLC and Allen.  Among other things, the declaratory judgment will restrain the SPLC from continuing to engage in these improper actions, against Allen and others.

WHEREFORE, Allen requests a declaratory judgment against Defendant SPLC, plus costs, reasonable attorney's fees, and such other and further relief as the Court deems just and appropriate, that the SPLC contravened and violated requirements for 501c3 status by its following actions:

- Receipt of stolen property, namely the Dilloway Stolen Documents, in or about May 2015, in violation of Alabama law and Rules of Professional Conduct 1.15(b), 4.2(a), 4.4(a), 8.4(b), and 8.4(c)

- Payment of money or other consideration to Randolph Dilloway for the Dilloway Stolen Documents in or about May 2015, in violation of Alabama law and Rules of Professional Conduct 1.15(b), 4.2(a), 4.4(a), 8.4(b), and 8.4(c)

- False statements and mail fraud by using inflated "hate group" tallies in the SPLC's 2014 "Hate Map," published in February 2015, in violation of federal law and Rule of Professional Conduct 4.1(a)

- False statements and mail fraud by use of an amorphous, self-serving definition of "Hate Group" at odds with its widely-accepted connotation in the SPLC's 2010-2016 "Hate Maps," in violation of federal law and Rule of Professional Conduct 4.1(a)

- False statements and mail or wire fraud by deliberate inaccurate statements regarding Majid Nawaz on the SPLC's list of "anti-Muslim extremists," a list prominently displayed on the SPLC's website in 2016 and 2017, in violation of federal law and Rule of Professional Conduct 4.1(a)

- False statements and mail fraud by falsely stating that Allen had "infiltrated" the Baltimore City Law Department in the SPLC's 2016 "Hate Map," in violation of federal law and Rule of Professional Conduct 4.1(a)

- Improperly participating in partisan political campaigns against announced candidates in the 2016 electoral cycle in violation of federal law applicable to 501c3 organizations

- False statements and mail fraud by falsely stating on the SPLC's 2016 IRS Form 990 that it had not participated in partisan political campaigns, in violation of federal law and Rule of Professional Conduct 4.1(a)

- Menacing or harassment with a shotgun by Morris Dees acting for the SPLC, as described in Dees' 1991 and 2003 autobiographies, in violation of Alabama law and Rules of Professional Conduct 8.4(b) and 8.4(c)

- Engaging in conduct prejudicial to the administration of justice by submitting documents before a judicial tribunal replete with smears, name-calling, and invective, in 2015, in violation of Rule of Professional Conduct 8.4(d)

- Disclosure of confidential and /or privileged documents in the SPLC's May 20, 2015 "Chaos at the Compound" article written by Beirich, in violation of Rule of Professional Conduct 4.4(b)

- Disclosure of confidential and / or privileged documents in its August 17, 2016 article about Allen written by Beirich, in violation of Rule of Professional Conduct 4.4(b)

- Failure to properly train and supervise Beirich and Potok in legal matters such as attorney client privilege, breaches of confidentiality agreements, receipt of stolen property, and commercial bribery, in violation of Rule of Professional Conduct 5.3

- Seeking to destroy organizations the SPLC describes or monitors as so-called "hate groups" and persons it describes as hateful or "extremist"

- Advocating and / or orchestrating violations of the constitutional rights of Allen and other entities and persons it describes or monitors as so-called "hate groups," hateful persons, or "extremists"

- Disregard of even a semblance of balance or objectivity in its August 17, 2016 Article about Allen and in other articles it has published about other entities and persons it describes or monitors as so-called "hate groups," hateful persons, or "extremists"

- Disregard of the Rule of Professional Conduct 1.2(b) that a lawyer's representation of a client does not constitute an endorsement of the client's political, economic, social, or moral views

- Disregard of the Rules of Professional Conduct admonition that lawyers should accept a fair share of unpopular matters or unpopular clients

- A primary focus on fundraising, which, among aspects, leads it to adopt sensationalist supermarket tabloid style journalism

- Massive surveillance operations, which include numerous informants and spies.

## COUNT II

### (RICO § 1962(c) CLAIM AGAINST BEIRICH AND POTOK)

133.   Allen incorporates the allegations set forth in Paragraphs 1 through 120.

### Parties

134**.**   Plaintiff Allen is at attorney practicing law in Maryland and the District of Columbia.  Since December 2015, he has practiced as a solo practitioner.  He is a "person" as defined in 18 U.S.C. § 1961(3) of the Racketeer Influenced and Corrupt Organizations Act and accordingly is entitled to sue for civil remedies under 18 U.S.C.  § 1964(c) of the RICO Act.

135.   Defendant Beirich is an individual capable of holding a legal or beneficial interest in property and accordingly is a "person" under 18 U.S.C. § 1961(3).

136.   Defendant Potok is an individual capable of holding a legal or beneficial interest in property and accordingly is a "person" under 18 U.S.C. § 1961(3).

### RICO Enterprise

137.   "Enterprise" is defined in the RICO statute as follows: "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4).

138.   Within the SPLC a subset of SPLC officers and employees, including Beirich, Potok, and others, formed and conducted an association in fact known as the "Intelligence Project."  The Intelligence Project had an ascertainable structure, with Beirich as its Director and Potok as the editor in chief of its major publications;  and continuity over time – more than a decade -- of structure and personnel.   The Intelligence Project, accordingly, was an enterprise in accordance with the RICO definition.

139.   The Intelligence Project enterprise engaged in, and its activities affected, interstate commerce, among other ways through conducting surveillance across the U.S.A. and distributing publications across the U.S.A.

140.   The SPLC, a corporation that encompasses the Intelligence Project and other special departments and divisions, is also an enterprise in accordance with the RICO definition.

141.    The SPLC enterprise engages in, and its activities affect, interstate commerce, among other ways through conducting surveillance across the U.S.A. and distributing publications across the U.S.A.

**Pattern of Racketeering Activity**

142.    Beirich, as Director of the Intelligence Project, and Potok, as editor in chief of the Intelligence Project's publications, agreed to and did conduct the Intelligence Project RICO enterprise and the SPLC RICO enterprise through a pattern of racketeering activity, specifically as follows:

143.    **National Stolen Property Act, 18 U.S.C. § 2315.**   The Intelligence Project and SPLC, conducted through and by the leadership and management of Beirich and Potok, knowingly received stolen property valuing $5000 or more that crossed interstate lines, namely the Dilloway Stolen Documents, as described in Paragraphs 58-67 of this complaint;  they therefore  violated the Alabama criminal statute prohibiting receipt of stolen property, i.e., Section 13A-8-16 of the Alabama Criminal Code:

https://law.justia.com/codes/alabama/2006/13297/13a-8-16.html;

also the federal National Stolen Property Act, 18 U.S.C. § 2315

https://www.law.cornell.edu/uscode/text/18/2314, a RICO predicate act under 18 U.S.C. § 1961 (1).

144.   **The Travel Act, 18 U.S.C. § 1952**.  The Intelligence Project and SPLC, conducted through and by the leadership and management of Beirich and Potok, engaged in commercial bribery of a fiduciary, namely Randolph Dilloway, as described in Paragraphs 58-67 of this complaint;  they therefore violated the Alabama criminal statute prohibiting commercial bribery of a fiduciary, i.e., Section 13A-11-120 of the Alabama Criminal Code:

https://law.justia.com/codes/alabama/2015/title-13a/chapter-11/article-5/section-13a-11-120/ ;

also the federal Travel Act, 18 U.S.C. § 1952: https://www.law.cornell.edu/uscode/text/18/1952 , a RICO predicate act under 18 U.S.C. § 1961 (1).

145.   **Mail Fraud, 18 U.S.C. § 1341.**   The elements of a violation of the mail fraud statute are (1) the use of the U.S. Mails or a private or commercial interstate carrier (2) for the purpose of executing or attempting to execute a scheme or artifice to defraud.  18 U.S.C. § 1341. Under 18 U.S.C. § 1346, "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.  As described in Paragraphs 60-71 of this complaint, The Intelligence Project and SPLC, conducted through and by the leadership and management of Beirich and Potok, violated the mail fraud statute by use of the U.S. Mails or private or commercial interstate carriers to attempt to execute and to execute a scheme or artifice to deprive the National Alliance of the honest services of Dilloway, who owed it fiduciary duties, thereby injuring Allen as described in paragraphs 96-101.  Mail fraud is a RICO predicate act under 18 U.S.C. § 1961 (1).

146.   **Mail Fraud, 18 U.S.C. § 1341.**   As described in Paragraphs 113-115 of this complaint, The Intelligence Project and SPLC, conducted through and by the leadership and management of Beirich and Potok, violated the mail fraud statute by use of the U.S. Mails or private or commercial interstate carriers to distribute "hate maps" across the U.S.A. falsely stating that Allen had "infiltrated" the Baltimore City Law Department, in support of their attempt to execute and their execution of a scheme or artifice to defraud by fundraising based on false statements about Allen and at the expense and injury of Allen.

147.   **Mail Fraud, 18 U.S.C. § 1341.**   As described in Paragraphs 101-103 of this complaint, The Intelligence Project and SPLC, conducted through and by the leadership and management of Beirich and Potok, violated the mail fraud statute by use of the U.S. Mails or private or commercial interstate carriers to distribute publications across the U.S.A. intentionally

inflating their "hate group" tallies, in support of their attempt to execute and their execution of a scheme or artifice to defraud donors by deceitful fundraising.

148.   **Mail Fraud, 18 U.S.C. § 1341.**   As described in Paragraphs 104-108 of this complaint, The Intelligence Project and SPLC, conducted under the leadership and management of Beirich and Potok, violated the mail fraud statute by use of the U.S. Mails or private or commercial interstate carriers to distribute publications across the U.S.A. that intentionally used a definition of "hate group" at odds with its widely accepted connotation, thus falsely attributing violent ideology and actions to nonviolent groups and persons, in support of The Intelligence Project's and the SPLC's attempt to execute and their execution of a scheme or artifice to defraud donors by deceitful fundraising.

149.   **Mail Fraud, 18 U.S.C. § 1341.**   As described in Paragraphs 109-112 of this complaint, The Intelligence Project and SPLC, conducted under the leadership and management of Beirich and Potok, violated the mail fraud statute by use of the U.S. Mails or private or commercial interstate carriers to distribute publications across the U.S.A. that contained intentionally false statements regarding Maajid Nawaz, in support of The Intelligence Project's and the SPLC's attempt to execute and their execution of a scheme or artifice to defraud donors by deceitful fundraising.

150.   **Mail Fraud, 18 U.S.C. § 1341.**   As described in Paragraphs 116-117 of this complaint, the SPLC, conducted under the leadership and management of Beirich and Potok, violated the mail fraud statute by use of the U.S. Mails or private or commercial interstate carriers to communicate a false statement under penalties of perjury in an IRS Form 990 that it did not "engage in direct or indirect political campaign activities on behalf of or in opposition to

candidates for public office," in support of the SPLC's attempt to execute and their execution of a scheme or artifice to defraud donors by deceitful fundraising.

151.   **Mail Fraud, 18 U.S.C. § 1341, and Wire Fraud, 18 U.S.C. § 1343.**  As described in Paragraph 34 of this complaint, the Intelligence Project and SPLC, conducted under the leadership and management of Beirich and Potok, violated the mail and wire fraud statutes by use of interstate wire or mail communications to make numerous intentionally false statements about Charles Murray in support of The Intelligence Project's and the SPLC's attempt to execute and their execution of a scheme or artifice to defraud donors by deceitful fundraising.

152.   The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

153.   Beirich and Potok directly and indirectly conducted and participated in the conduct of the Intelligence Project RICO enterprise's and SPLC RICO enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

154.   By reason of and as a direct and proximate result of Beirich's and Potok's racketeering activities and violations of 18 U.S.C. § 1962(c), Allen has been injured in his business and property, in that, as described in paragraphs 95-100 and 113-115 of this complaint, he was terminated from his position in the Baltimore City Law Department and his reputation as an attorney was severely damaged.

**WHEREFORE**, Allen requests entry of judgment against Defendants Beirich and Potok for actual damages of $1,500,000, trebled in accordance with 18 U.S.C. 1964(c), plus costs of suit and reasonable attorney's fees, and such other relief as the Court deems appropriate.

## COUNT III

### (RICO § 1962(d) CLAIM AGAINST BEIRICH AND POTOK)

155.    Allen incorporates the allegations set forth in Paragraphs 1-120 and 134-154.

156.    As set forth in Count II, Beirich as Director of the Intelligence Project and Potok as editor in chief of its publications conducted the affairs of the Intelligence Project RICO enterprise and the SPLC RICO enterprise through a pattern of racketeering activity.  Inherent in Beirich's and Potok's relationships with these enterprises was dialogue, coordination, collaboration, and agreement between Beirich and Potok as to the actions, policies, and values of the enterprises.  It would not have been possible for them to have conducted the affairs of the enterprises without this dialogue, coordination, collaboration, and agreement.

157.    Allen, accordingly, alleges that Beirich and Potok conspired with each other and with other persons to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

158.    By reason of and as a direct and proximate result of this conspiracy, the overt acts taken in furtherance of the conspiracy, and violations of 18 U.S.C. § 1962(d), Allen has been injured in his business and property in that**,** as described in paragraphs 95-100 and 113-115 of this complaint, he was terminated from his position in the Baltimore City Law Department and his reputation as an attorney was severely damaged.

**WHEREFORE**, Allen requests entry of judgment against Defendants Beirich and Potok for actual damages of $1,500,000, trebled in accordance with 18 U.S.C.  1964(c), plus costs of suit and reasonable attorney's fees, and such other relief as the Court deems appropriate.

## COUNT IV

### (TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE CLAIM AGAINST BEIRICH AND THE SPLC)

159.    Allen incorporates the allegations set forth in Paragraphs 1 through 120.

160.    Prior to the publication by Beirich and the SPLC of the August 17, 2016 Article,

Allen had an at will contractual employment relationship with the City of Baltimore.

161.    Beirich and the SPLC knew of the at will contractual employment relationship

described in the prior paragraph.

162.    Beirich and the SPLC by means of the August 17, 2016 Article intentionally

interfered with the at will contractual employment relationship for improper purposes or by

improper methods, including knowingly receiving and then using stolen documents in the article,

engaging in commercial bribery to obtain the stolen documents, committing mail fraud, violating

attorney professional ethics, and acting outside the scope of the SPLC's  501c3 mandate.

163.    Beirich's and the SPLC's interference caused Allen damages, including the loss

of his employment at the City of Baltimore and severe damage to his reputation as an attorney.

164.    Beirich's and the SPLC's interference constituted conscious and deliberate

wrongdoing, motivated by wrongful motives and ill will.

WHEREFORE, Plaintiff Glen K. Allen demands judgment against defendants Beirich

and the SPLC in amounts to be determined at trial but which currently exceed $1,500,000 in

compensatory damages and $5,000,000 in punitive damages, plus costs, reasonable attorney's

fees, and such other and further relief as the Court deems just and appropriate.

## COUNT V

## (TORTIOUS INTERFERENCE WITH CONTRACT
## CLAIM AGAINST BEIRICH AND THE SPLC)

165.    Allen incorporates the allegations set forth in Paragraphs 1 through 120.

166.    As of May 2015 Randolph Dilloway was subject to a confidentiality agreement

covering the documents and other information he examined while an employee of the National

Alliance.

167.    Allen was a third party beneficiary (as were others) of the confidentiality agreement.

168.    Beirich and the SPLC knew of the confidentiality agreement and knew that Allen was a third party beneficiary of the agreement.

169.    Beirich and the SPLC intentionally interfered with the confidentiality agreement for improper purposes or by improper methods, including knowingly receiving and then using stolen documents protected by the confidentiality agreement, engaging in commercial bribery to obtain the stolen documents, committing mail fraud, violating attorney professional ethics, and acting outside the scope of the SPLC's  501c3 mandate.

170.    Beirich's and the SPLC's interference caused Allen damages, including the loss of his employment at the City of Baltimore and severe damage to his reputation as an attorney.

171.    Beirich's and the SPLC's interference constituted conscious and deliberate wrongdoing, motivated by wrongful motives and ill will.

WHEREFORE, Plaintiff Glen K. Allen demands judgment against defendants Beirich and the SPLC in amounts to be determined at trial but which currently exceed $1,500,000 in compensatory damages and $5,000,000 in punitive damages, plus costs, reasonable attorney's fees, and such other and further relief as the Court deems just and appropriate.

## COUNT VI

### (NEGLIGENT TRAINING AND
### SUPERVISION CLAIM AGAINST THE SPLC)

172.    Allen incorporates the allegations set forth in Paragraphs 1 through 120.

173.    Beirich, as Director of the SPLC's Intelligence Project, and Potok, as editor in chief of the Intelligence Project's publications, were employees of the SPLC at all times relevant to the allegations in this complaint.  Beirich remains an employee of the SPLC.  On information

and belief, Potok, after more than two decades as an SPLC employee, ceased being an employee in approximately March 2017.

174.   The SPLC, with its prodigious surveillance capabilities, media access, and financial resources, placed and retained Beirich and Potok in positions of enormous power over the vocations and reputations of members of the public.  Moreover, many of the decisions Beirich and Potok were called upon to make or participate in involved momentous legal issues relating to the First Amendment and free expression, defamation, and invasion of privacy, among others.

175.   In proportion to the substantial likelihood and grave severity of potential harm flowing to the public from Beirich's and Potok's actions and decisions must be the SPLC's duty to properly train and supervise Beirich and Potok.   This duty is enhanced by the fact that the SPLC is a law firm subject to ethical responsibilities to train and supervise its employees, lawyer and nonlawyer.

176.   The training and supervision the SPLC provided to Beirich and Potok fell short of any reasonable standard.  This is shown, among other ways, by the May 20, 2015 "Chaos at the Compound" and August 17, 2016 "Baltimore Hires Neo Nazi Lawyer" articles, both written by Beirich with the evident collaboration of Potok as the Intelligence Project editor in chief.  Both articles address (both explicitly and implicitly), erroneously and without any evidence of supervision by a lawyer, important legal issues, including disclosure of privileged and confidential documents, alleged justifications for breaching a confidentiality agreement, alleged justifications for invasion of privacy, alleged justifications for defamation, and the propriety of a 501c3 organization engaging in one-sided, tabloid-style journalism.

177.     As a direct and proximate result of the SPLC's inadequate training and supervision of Beirich and Potok, the SPLC improperly received and disclosed the Dilloway Stolen Documents, including confidential and privileged documents, in the August 17, 2016 article, leading to Allen's termination from the Baltimore City Law Department and damage to his reputation as an attorney;  and falsely stated in the SPLC's 2016 "Hate Map" that Allen had "infiltrated" the Baltimore City government, thus further damaging Allen's reputation.

WHEREFORE, Plaintiff Glen K. Allen demands judgment against the SPLC in amounts to be determined at trial but which currently exceed $1,500,000 in compensatory, plus costs and such other and further relief as the Court deems just and appropriate.

## COUNT VII

## (RESTITUTION / UNJUST ENRICHMENT AGAINST DEFENDANT SPLC)

178.     Allen incorporates the allegations set forth in Paragraphs 1 through 120 and 121 through 132.

179.     A defendant is unjustly enriched and must provide restitution when the defendant knowingly obtains or retains money or benefits that in justice and equity belong to another.

180.     The SPLC benefitted monetarily and in other respects from the August 17, 2016 Article about Allen, in that (1) the SPLC by means of the article improperly advocated and successfully orchestrated the destruction of Allen's career and reputation, and (2) the SPLC arranged for the publication of the article in at least a dozen newspapers around the country and internationally –  all of which served to maintain and enhance the SPLC's power and prestige as a supposed civil rights organization and public service law firm, which in turn served to maintain and enhance the flow of donations and valuable media access for the SPLC.

181.    It is relevant in this regard that the SPLC has kept the August 17, 2016 Article on its website from August 17, 2016 to the present day, as evidence to the general public of the SPLC's potent and successful surveillance and its power and prowess in destroying its victims.

182.    The benefits the SPLC has reaped from the August 17, 2016 Article have been at Allen's expense.  In justice and equity these benefits should be taken from the the SPLC and restored to Allen.  Among the relevant considerations in this regard are those set forth in Paragraphs 122, 123, 125, 129, and 130.

WHEREFORE, Plaintiff Glen K. Allen demands judgment against defendant SPLC in an restitutionary amount to be determined at trial, plus costs, reasonable attorney's fees, and such other and further relief as the Court deems just and appropriate.

## COUNT VIII

## (DEFAMATION CLAIM AGAINST BEIRICH, POTOK, AND THE SPLC)

183.    Allen incorporates the allegations set forth in Paragraphs 1 through 120.

184.    As set forth in Paragraph 113, the SPLC "Hate Map" published all across the United States in 2017, as part of the Intelligence Project for which Beirich was the Director and Potok the editor in chief, prominently displays Allen's photograph next to the caption in bold red:  "EXPOSING RACISTS WHO INFILTRATE PUBLIC INSTITUTIONS."

file:///Users/glenallen/Downloads/allen%201.pdf.  Under this caption, the SPLC "Hate Map" states: "Hate group members and followers of their ideologies sometimes manage to obtain important positions of power. When the City of Baltimore recently hired Glen Keith Allen, a neo-Nazi, nobody knew of his involvement with white supremacist groups, except for us. Because of our investigation and expose, he was swiftly fired."  Thus, Beirich, Potok, and the

SPLC publicly claimed Allen "infiltrated" the City of Baltimore law department with "racist" and "neo-Nazi" policies, which the SPLC put a stop to by causing his firing.

185.     As set forth in Paragraph 114, the Merriam-Webster dictionary defines "infiltrate" as follows:  "to enter or become established gradually or unobtrusively usually for subversive purposes, e.g., 'the intelligence staff has been infiltrated by spies.'"   The Collins Dictionary defines it as follows: "to penetrate or cause to penetrate (a region or group) gradually or stealthily, so as to attack or seize control from within."  The Dictionary.com definition is as follows: "to pass a small number of (soldiers, spies, or the like) into a territory or organization clandestinely and with hostile or subversive intent."

186.     As set forth in Paragraph 115, Allen did not "infiltrate" the Baltimore City Law Department in accordance with these or any other widely accepted definitions.   He did not enter into it secretly or clandestinely with hostile or subversive intent so as to attack it or seize control of it from within.  He was hired openly and in accordance with normal procedures by the City Solicitor, George Nilson, an active and prominent liberal Democrat, who had known him for decades while both worked at DLA Piper;  while in the City Law Department, Allen was not in a policy-making position, never let political  issues influence his legal work, and in fact never even talked politics at the office.  He remained loyal to his professional and ethical obligations to represent his client, the City of Baltimore, a city primarily composed of African-American residents and with an African-American mayor and primarily African-American city council, zealously and competently.

187.     The SPLC smear, from which it profited handsomely, essentially accuses Allen of professional ethical violations and incompetence, for which the SPLC had no evidence because it was not true.  It was a knowingly false statement.

188.    Accusing Allen of being an unethical and / or incompetent attorney is defamatory per se.

189.    Beirich, Potok, and the SPLC published this defamation knowing it was untrue or recklessly disregarding whether it was true or untrue.

190.    Beirich's, Potok's, and the SPLC's defamation further damaged Allen's reputation as an attorney.

191.    Beirich's, Potok's and the SPLC defamation constituted conscious and deliberate wrongdoing, motivated by wrongful motives and ill will.

WHEREFORE, Plaintiff Glen K. Allen demands judgment against defendants Beirich, Potok, and the SPLC in amounts to be determined at trial but which currently exceed $1,500,000 in compensatory damages and $5,000,000 in punitive damages, plus costs, and such other and further relief as the Court deems just and appropriate.

## COUNT IX

### (AIDING AND ABETTING BREACH OF CONTRACT CLAIM AGAINST BEIRICH, POTOK, AND THE SPLC)

192.    Allen incorporates the allegations set forth in Paragraphs 1 through 120.

193.    The confidentiality agreement (part of the employment agreement) between Randolph Dilloway and the National Alliance described in Paragraphs 55 and 56 was a valid agreement.

194.    Dilloway breached the confidentiality agreement by stealing numerous thumb drives of confidential documents (the Dilloway Stolen Documents) and transmitting them to Beirich, Potok, and the SPLC.

195.    Dilloway further breached the confidentiality agreement by cooperating with Beirich, Potok, and the SPLC in publishing the information in the Dilloway Stolen Documents in the SPLC's publications.

196.    Beirich, Potok, and the SPLC aided and abetted Dilloway's breaches described in the prior two paragraphs by receiving the Dilloway Stolen Documents, paying consideration to Dilloway for them, and then publishing them in the SPLC's publications.

197.   Allen was injured as a proximate result of Beirich's, Potok's, and the SPLC's aiding and abetting Dilloway's breaches, in that the publication of information from the Dilloway Stolen Documents in the SPLC's August 17, 2016 article caused Allen's termination from his employment at the Baltimore City Law Department and damaged his reputation as an attorney.

WHEREFORE, Plaintiff Glen K. Allen demands judgment against defendants Beirich, Potok, and the SPLC in amounts to be determined at trial but which currently exceed $1,500,000 in compensatory damages and $5,000,000 in punitive damages, plus costs, and such other and further relief as the Court deems just and appropriate.


_____/s/_____

Glen K. Allen, Esq.
Bar Number 06150
502 Edgevale Road
Baltimore, MD 21210