# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **Glen K. Allen** | * | |
| | * | **Civil Action No. CCB-18-3781** |
| v. | * | |
| | * | |
| **Heidi Beirich,** *et al.*, | * | |

## MEMORANDUM

Pending before the court is the Southern Poverty Law Center and Heidi Beirich's (the "SPLC defendants") motion to dismiss (ECF 9) and Mark Potok's motion to dismiss (ECF 10). Both motions have been fully briefed and no oral argument is necessary. For the reasons stated below, the motions to dismiss will be granted.

## FACTS[1]

Glen K. Allen is a lawyer, who, in February 2016, began working as an independent contractor for the City of Baltimore Law Department. Compl. ¶¶ 49, 51. Heidi Beirich is the director of the Southern Poverty Law Center's ("SPLC") Intelligence Project. *Id.* ¶ 3. Mark Potok worked for SPLC from 1997 to 2017 as editor-in-chief of the Intelligence Project and a Senior Fellow. *Id.* ¶ 4. This case arises from two publications by the SPLC, Heidi Beirich, and Mark Potok (the "defendants") regarding Allen's alleged ties to the National Alliance ("NA"), an alleged white supremacist group.

In May of 2015, Randolph Dilloway, an accountant at NA, secretly scanned thousands of NA documents onto thumb drives and, according to Allen, sold them to SPLC for over $5,000, in violation of his confidentiality agreement with NA. *Id.* ¶¶ 56, 59, 60, 62. Based on these documents, the defendants published an article (the "August 17, 2016, article") regarding Allen's

---

[1] The complaint is 85 pages long, with multiple pages devoted to attacking the SPLC's fundraising and "enormous headquarters" ("The SPLC uses the word 'Poverty' in its name but in reality is fabulously wealthy," Compl. ¶ 35) and describing Allen's early life, extracurricular activities, and accolades ("[Allen] was a diligent student and did well in law school, finishing near the top of his class and serving as Executive Director of the law review," *id.* ¶ 43). This section summarizes only the relevant parts of Allen's complaint.

1

ties to NA. *Id.* ¶ 76. At the time, Allen was working as an independent contractor at the Baltimore City Law Department. *Id.* The article incorporated information from the documents received from Dilloway, including: 1) a 1987 letter from the founder of NA to his attorney, on which Allen was copied (and which Allen claims is privileged); 2) a receipt for Allen's subscription to NVM[2] and a dues payment; 3) a receipt for Allen's dues payments and a donation to NA; 4) a receipt for a "Jailing Opinions DVD"; and 5) a receipt for Allen's attendance at a "Holocaust Revisionist Conference." *Id.* ¶ 78. The article also alleged that a political party Allen donated to, the American Eagle Party, was racist. *Id.* ¶ 89. After the August 17th article was published, Allen was fired from the Baltimore City Law Department. *Id.* ¶ 96.

Sometime in 2017, the defendants published the 2016 Hate Map, which featured a photograph of Allen and stated that "When the City of Baltimore recently hired Glen Keith Allen, a neo-Nazi, nobody knew of his involvement with white supremacist groups, except for us." *Id.* ¶ 84. The Hate Map displayed Allen's photograph next to a caption reading "exposing racists who infiltrate public institutions" and included text that "[b]ecause of our investigation and expos[é], he was swiftly fired." *Id.* ¶ 113.

The complaint also contains general allegations against SPLC, including that it improperly participated in partisan political campaign activities in the 2016 election cycle (*id.* ¶¶ 116–117), that it has engaged in unethical actions prejudicial to the administration of justice (*id.* ¶¶ 118–119), and that it has provided slanted information to the FBI (*id.* ¶ 120), all of which Allen contends is inconsistent with its status as a law firm and as a 501(c)(3) organization.

Allen brings the following claims: 1) a claim for declaratory judgment that SPLC's improper and illegal actions contravene and violate requirements for its 501(c)(3) status; 2) a claim under the Racketeer Influenced and Corrupt Organizations (RICO) Act against Beirich and

---

[2] It is not clear from the complaint what "NVM" is.

Potok; 3) a RICO conspiracy claim against Beirich and Potok; 4) a tortious interference with prospective advantage claim against Beirich and SPLC; 5) a tortious interference with contract claim against Beirich and SPLC; 6) a negligent training and supervision claim against SPLC; 7) a restitution and unjust enrichment claim against SPLC; 8) a defamation claim against Beirich, Potok, and SPLC based on the 2016 Hate Map; and 9) an aiding and abetting breach of contract claim against Beirich, Potok, and SPLC.

## STANDARD OF REVIEW

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

## DISCUSSION

### I. Personal Jurisdiction

The Fourth Circuit has held that the RICO statute, through 18 U.S.C. § 1965(d), "authorizes nationwide service of process and, thus, the exercise of personal jurisdiction in any district court." *D'Addario v. Geller*, 264 F. Supp. 2d 367, 386 (E.D. Va. 2003) (citing *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997)). Therefore,

> Because a federal statute provides the basis for personal jurisdiction, the Fifth Amendment's Due Process Clause applies to protect the liberty interests of individuals against unfair burden and inconvenience. It is only in highly unusual cases that inconvenience will rise to a level of constitutional concern. The burden is on the defendant to demonstrate that the assertion of jurisdiction in the forum will make litigation so gravely difficult and inconvenient that he unfairly is at a severe disadvantage in comparison to his opponent.

*Id.* at 387 (internal quotations and citations omitted). In order to challenge the use of the nationwide service process in a RICO case, the defendant must demonstrate that the RICO claim is "not colorable" i.e. "implausible, insubstantial, or frivolous." *Id.* at 388.

Potok argues that the RICO claim is "not colorable" and that the exercise of personal jurisdiction over him would violate due process as he has no contacts with Maryland, and was not involved in receiving the NA documents from Dilloway nor writing the August 17, 2016, article or 2016 Hate Map. Declaration of Mark Potok, ECF 10-2.

As discussed below, the RICO claim does not survive the motions to dismiss, but it cannot be said that the RICO claim is "frivolous." Allen's allegations to support his RICO claim are not so implausible or insubstantial as to make the claim not colorable. *See Becker v. Noe*, No. ELH-18-00931, 2019 WL 1415483, at *18 (D. Md. March 27, 2019) (a RICO claim can be colorable even if it does not satisfy the pleading requirements of Rule 12(b)(6)).[3] Although Potok's affidavit asserts he has no contacts with Maryland, the Fifth Amendment due process

---

[3] Unreported cases are cited for the soundness of their reasoning, not for any precedential value.

standard is not based on an analysis of "minimum contacts" with the forum state. *Id.* Rather, the defendant must show extreme inconvenience or unfairness. As Potok has not done that, the court may properly exercise personal jurisdiction over him with respect to the RICO claim.

Additionally, "[w]hen a federal statute authorizes nationwide service of process, and the remaining state law claims arise from the same nucleus of operative facts, the court may exercise pendent personal jurisdiction to adjudicate state claims that are properly within the court's subject matter jurisdiction." *D'Addario*, 264 F. Supp. 2d at 387; *see ESAB*, 126 F.3d at 628. Therefore, the court may exercise jurisdiction over Potok in regard to all the claims against him.[4]

## II. Amicus Brief from the Fitzgerald Griffin Foundation

"There is no Federal Rule of Civil Procedure that applies to motions for leave to appear as amicus curiae in a federal district court. District courts therefore have discretion whether to grant or deny such leave and often look for guidance to Rule 29 of the Federal Rules of Appellate Procedure." *Doyle v. Hogan*, No. DKC 19-0190, 2019 WL 3500924, at *4 (D. Md. Aug. 1, 2019). Under Rule 29, an "amicus curiae may file a brief only by leave of court or if the brief states that all parties have consented to its filing." Fed. R. App. P. 29(a)(2). The brief must be filed "no later than 7 days after the principal brief of the party being supported is filed." Fed. R. App. P. 29(a)(6).

The Fitzgerald Griffin Foundation, joined by several other organizations, filed an amicus brief in opposition to dismissal of the case on April 10, 2019. This was nine days after Allen filed his briefs in opposition to defendants' motions to dismiss. Further, Fitzgerald Griffin Foundation included in their brief that "all counsel in this case were provided with a draft of this memorandum, containing exactly the same arguments as the final version" and "all counsel were given an opportunity to inform me if they were going to object to its filing and none of them

---

[4] Potok also incorporates the arguments made by the SPLC defendants in their motion to dismiss.

5

answered in the affirmative." Amicus Brief at 23, ECF 20. Regardless of whether a non-answer is considered a consent, defendants' counsel did not receive the draft before it was filed because counsel for Fitzgerald Griffin Foundation sent it to the wrong email addresses. SPLC Defendants' Reply, Ex. A, ECF 21. Nor did Fitzgerald Griffin Foundation file a motion for leave to file an amicus brief, which is required under United States District Court for the District of Maryland Standing Order 2018-07.

Because the amicus brief does not comport with Fed. R. App. P. 29 or Standing Order 2018-07, the court will not consider it.

### III. Declaratory Judgment Act Claim

The Federal Declaratory Judgment Act gives a federal district court the power to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). It does not apply, however, to cases "with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code." That section, 26 U.S.C. § 7428(a), provides that an organization may challenge its 501(c)(3) status by requesting a declaration with respect to such classification in the United States Tax Court, the United States Court of Federal Claims, or the district court of the United States for the District of Columbia.

This prohibition on declaratory judgments in cases "with respect to Federal taxes" has been interpreted to bar those suits "restraining the assessment or collection of taxes." *Z Street, Inc. v. Koskinen*, 44 F. Supp. 3d 48, 58–59 (D.D.C. 2014). Therefore, in *McGlotten v. Connally*, an action seeking to "enjoin the Secretary of Treasury from granting tax benefits to fraternal and nonprofit organizations which exclude nonwhites from membership," the court held that the case had "nothing to do with the collection or assessment of taxes" and was not barred by the

Declaratory Judgment Act. 338 F. Supp. 448, 450, 453–54 (D.D.C. 1972).

Here, Allen requests that this court declare the SPLC is not properly classified as a 501(c)(3) entity. Unlike *McGlotten*, this case does not involve the government's allegedly unconstitutional actions. Rather, Allen disputes only whether the IRS properly has continued to classify SPLC as a 501(c)(3) tax exempt entity, which is a tax status given for the purpose of the collection and assessment of taxes. Therefore, Allen's claim is an action "with respect to Federal taxes" and must be brought under section 7428 of the Internal Revenue Code. Under § 7428, such an action must be brought in the United States Tax Court, the United States Court of Federal Claims, or the district court of the United States for the District of Columbia. This court is not a proper forum. *See Z Street*, 44 F. Supp. 3d at 56; *Barber v. IRS*, Civil No. Y-96-2366, 1997 WL 151996, at *1 (D. Md. Jan. 7, 1997). Accordingly, the court will dismiss Count I.

## IV. Tort Claims

Allen alleges four tort claims, all arising from the defendants' August 17, 2016, article and 2016 Hate Map. Count IV alleges that Beirich and SPLC, by means of the August 17, 2016, article, "intentionally interfered with the at will contractual employment relationship"; Count VI alleges that SPLC failed to properly train and supervise Beirich and Potok, which resulted in their receipt and disclosure of the NA documents; Count VII alleges unjust enrichment based on the August 17, 2016, article; and Count VIII is a defamation claim based on the 2016 Hate Map. The defendants argue that these tort claims are all based on the defendants' publications, which are protected under the First Amendment.

Applicability of First Amendment defenses

A plaintiff may not attempt an "end-run around First Amendment strictures" protecting speech by instead suing for "defamation-type damages under non-reputational tort claims."

7

*Food Lion Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999). Rather, non-defamation torts based on speech must meet First Amendment requirements. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988). Therefore, where, as here, the allegations are based on statements by the defendants about Allen, a private individual,[5] on a matter of public concern,[6] state tort liability cannot attach unless Allen shows the defendants' statements are false, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16 (1990), and shows some level of fault, *id.* at 15. Further, there can be no state tort liability for the defendants' opinions in the publications that cannot be "provable as false."[7] *Id.* at 19–20.

Allen argues that he also alleges pecuniary damages from the loss of his job that are distinct from reputational damages and not subject to First Amendment requirements. He cites to *Cohen v. Cowles Media Co.*, where the Supreme Court held that a newspaper could be liable to a source for revealing his name in breach of an agreement of confidentiality, causing the source to lose his job. 501 U.S. 663, 671 (1991). In *Cohen*, though, the harm was caused by a breach of promise. *Id.* Here, Allen alleges harm arising from the defendants' publications, as

---

[5] Because the court finds that Allen does not show falsity in the publications, the court declines to decide whether Allen is a public figure who must also show actual malice.

[6] A matter is of public concern "when it can be fairly considered as relating to any matter of political, social or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). The parties do not appear to dispute that Allen's alleged association with NA was a matter of public concern, at least in connection with his role in the government. To the extent they do, the court finds that the publications by the defendants were on matters of public concern.

[7] *Milkovich* speaks of "media defendants" and expressly declined to decide whether these protections also would be available to non-media defendants. *Milkovich*, 497 U.S. at 20 n.6. The Supreme Court, however, has since indicated the distinction is immaterial. For example, the Supreme Court in *Snyder v. Phelps* found that the Westboro Baptist Church's speech was entitled to "special protection," 562 U.S. at 458, without discussing whether they were media or not. And in *Bartnicki v. Vopper*, 532 U.S. 514, 535 (2001), the Supreme Court did not distinguish between the First Amendment protections given to the media defendant and the non-media defendant. Therefore, the court does not address whether the defendants are "media defendants." *See Snyder v. Phelps*, 580 F.3d 206, 219 n.13 (4th Cir. 2009), *aff'd* 562 U.S. 443 (2011) (Although the Supreme Court has not addressed "the question of whether the constitutional protections afforded to statements not provably false should apply with equal force to both media and nonmedia defendants," "we believe that the First Amendment protects nonmedia speech on matters of public concern that does not contain provably false factual assertions. Any effort to justify a media/nonmedia distinction rests on unstable ground, given the difficulty of defining with precision who belongs to the 'media.'"); *see also First Nat'l Bank of Boston v. Belloti*, 435 U.S. 765, 777 (1978) ("The inherent worth of the speech . . . does not depend upon the identity of its source[.]").

the publications harmed Allen's reputation and led to his firing.[8] The harm Allen alleges is one to his reputation, not to an agreement between him and the defendants.[9] Therefore, in order for Allen to succeed on his tort claims, he must meet First Amendment requirements – that is, he must show that the defendants' statements are false.

The Publications

As explained below, the August 17, 2016, article and 2016 Hate Map are protected by the First Amendment. First, Allen does not allege that the factual statements in them are false. Second, the statements he objects to are non-actionable opinion or hyperbole.

"There are two subcategories of speech that cannot reasonably be interpreted as stating actual facts about an individual, and that thus constitute speech that is constitutionally protected." *Snyder v. Phelps*, 580 F.3d 206, 219 (4th Cir. 2009), *aff'd* 562 U.S. 443 (2011). The First Amendment "protect[s] statements on matters of public concern that fail to contain a 'provably false factual connotation.'" *Id.* Second, it protects "rhetorical statements employing 'loose, figurative, or hyperbolic language.'" *Id.* at 220. For example, a radio host's statement that certain defense contractors were "hired killers" was exaggerated rhetoric that "no reasonable listener would understand . . . to assert actual facts." *Id.* at 220–21 (quoting *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 301–02 (4th Cir. 2008)).

*August 17, 2016, article:* Allen objects to the defendants' characterization of him as a "well known" "Neo-Nazi" lawyer, Compl. ¶¶ 82–85, and of the American Eagle Party as racist, *id.* at ¶ 89, and the alleged implication in the article that he would act unethically in ongoing litigation, *id.* at ¶ 91. He also objects to the "one-sided and demonizing portrait" of him, as the

---

[8] Further, a pecuniary loss can still be reputational. In *Food Lion*, the Fourth Circuit held that a grocery store's alleged "lost sales" arising from an undercover investigation by a television news program about its food handling practices was reputational harm. 194 F.3d at 523–24.
[9] Allen does allege contract-related claims, which will be discussed later.

9

defendants did not include relevant facts such as Allen's *pro bono* work for African Americans. *Id.* ¶¶ 92–94.

Allen does not dispute the underlying factual assertions – namely, his ties to NA and the American Eagle Party – in the article. Allen alleges that the article contained the false implication that he would act unethically in litigation he was involved in. While the article noted that the "hiring of a known neo-Nazi to litigate [for Baltimore] surely raises questions" it cannot be said that the article implies that Allen would act unethically.

Allen's other allegations concern statements that are not actionable. He objects to the defendants' characterization of him as a "well known" neo-Nazi lawyer.[10] Although he argues that the sources the article cites do not support that he is "well known," it is not clear whether he asserts the statement is false. Compl. ¶¶ 82–84. To the extent he does, that he is "well known" is not a provably false factual connotation. Further, the characterization of the American Eagle Party as "racist" is opinion "that cannot be proven as verifiably true or false" and is not actionable. *Squitieri v. Piedmont Airlines, Inc.*, No. 3:17CV441, 2018 WL 934829, at *4 (W.D.N.C. Feb. 16, 2018) (collecting cases).

---

[10] It is not clear whether Allen alleges that the characterization of him as a neo-Nazi is false. He seemingly objects to it once in his complaint, stating that the defendants "interchangeably describe Allen as an 'attorney for the National Alliance' and as a 'Neo-Nazi Lawyer,' a smearing technique that ignores the admonition of legal ethics that lawyers should represent a fair share of unpopular matters or unpopular clients." Compl. ¶ 85. In his brief, he argues that the defendants should have included in the article Allen's *pro bono* work on behalf of African Americans, as "Neo-Nazis do not do such things, let alone 'well known neo-Nazi lawyers.' The SPLC Defendants knew this. But portraying the truth about Allen would undercut the message that the SPLC constantly sends in order to fundraise[.]" These statements do not directly dispute the characterization as false; therefore, to the extent that Allen objects to the "neo-Nazi" label, he has not shown falsity. As to Allen's argument that the defendants should have included his *pro bono* work, he cites to *Harte-Hanks Comm. Inc. v. Connaughton*, 491 U.S. 657 (1989). In *Harte-Hanks*, a newspaper was found to have acted with actual malice in its publication of false accusations of bribery against a judicial candidate, when they ignored witnesses who disputed the accusations, did not listen to tapes that could have confirmed or rejected the accusations, and did not interview a key witness. *Id.* at 681–85. Even under a lesser fault standard (assuming Allen is not a public figure), Allen has not plausibly alleged that the defendants should have included his *pro bono* work. Unlike witnesses or tapes that could prove or disprove bribery accusations, Allen's *pro bono* work does not prove or disprove the documents showing Allen's payment of dues and donations to National Alliance, which was the basis for the defendants' characterization of him as a neo-Nazi.

10

*2016 Hate Map*:

The relevant text of the 2016 Hate Map is:

**EXPOSING RACISTS WHO INFILTRATE PUBLIC INSTITUTIONS**
Hate group members and followers of their ideologies sometimes manage to obtain important positions of power. When the city of Baltimore recently hired Glen Keith Allen, a neo-Nazi, nobody knew of his involvement with white supremacist groups, except for us. Because of our investigation and exposé, he was swiftly fired.

Allen alleges that the 2016 Hate Map incorrectly stated that he "infiltrate[d]" the Baltimore City law department, as infiltrate implies he entered it "secretly or clandestinely with hostile or subversive intent so as to attack it or seize control of it from within." Compl. ¶ 186. "Infiltrate," however is "loose, figurative, or hyperbolic language," which in this context no reasonable reader would take to assert actual facts. Therefore, it is protected by the First Amendment. Allen also alleges the defendants accused him of being "an unethical and/or incompetent attorney." Compl. ¶ 188. Allen has not plausibly shown that the Hate Map implied he was incompetent or unethical.

*Bartnicki v. Vopper*

Allen also argues that the defendants improperly received and published confidential NA documents obtained from Dilloway. Although the First Amendment does not protect "the unlawful acquisition of information," "if a publisher lawfully obtains truthful information about a matter of public significance, then the government may not punish the publication of that information in the absence of a governmental interest of the highest order." *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 792 F. Supp. 2d 311, 330–31 (D.D.C. 2011). In *Bartnicki v. Vopper*, the Supreme Court held that the First Amendment protects an individual from liability for the publication of a recorded call even if that call was unlawfully intercepted by a third party, and even if the disclosure of the call violated federal and state wiretapping acts. 532

11

U.S. 514, 535 (2001). The defendants argue that their newsgathering activities and publication of the August article and 2016 Hate Map are protected under *Bartnicki*, even if Dilloway acted unlawfully in taking the documents.

*Bartnicki* may not apply when the publisher has itself obtained the information unlawfully. *Id.* at 528. While Allen argues that the defendants are not entitled to the *Bartnicki* protections because they participated in Dilloway's unlawful acts, this has not been plausibly alleged. First, although the defendants here may have known that the documents were unlawfully taken, the *Bartnicki* defendants similarly knew the recording at issue was made illegally and were still entitled to First Amendment protections for publishing it. Second, Allen does not plausibly allege that the defendants participated in Dilloway's taking of the documents as the complaint does not allege that Dilloway first made contact with SPLC until May 6, 2015, three days after he purportedly stole the confidential documents. Compl. ¶ 60. Finally, the defendants' alleged payment to Dilloway and the receipt of confidential information does not constitute participation or unlawful receipt. In *Jean v. Massachusetts State Police*, the First Circuit found that the publisher of an illegal recording, even though she "arguably participated . . . in a conspiracy to disclose the content[s]," was protected under *Bartnicki*, stating that "the fact that Yocum [the defendant in *Bartnicki*] received the tape 'passively' and Jean received the tape 'actively' is a distinction without a difference." 492 F.3d 24, 31–32 (1st Cir. 2007). Similarly, the fact that the defendants knew the information was confidential and paid for the information does not remove the *Bartnicki* First Amendment protection for publishing that information.[11]

---

[11] Allen alleges that the defendants' receipt of the information was unlawful because the receipt violated the Stolen Property Act, 18 U.S.C. § 2315, and Alabama's Receipt of Stolen Property Act, § 13A-8-16, and the payment for the documents violated the Travel Act, 18 U.S.C. § 1952, and Alabama's Commercial Bribery Act, § 13A-11-12. On this point, the court finds *Democratic Nat'l Comm. v. Russian Federation* helpful. 392 F. Supp. 3d 410 (S.D.N.Y. 2019). In that case, involving stolen emails from the Democratic National Committee (DNC), the DNC argued "that WikiLeaks should be considered an after-the-fact coconspirator for the theft [of the documents] based on its coordination to obtain and distribute the stolen materials." *Id.* at 434. The court held that "it is . . . irrelevant

12

This is unlike cases where the defendants themselves planned to and took internal confidential documents and made illegal recordings. *See Gaubatz*, 793 F. Supp. 2d at 317–18, 331–32. Therefore, even assuming Dilloway's conduct was illegal, it "does not suffice to remove the First Amendment shield from speech about a matter of public concern." *Bartnicki*, 532 U.S. at 535.

Allen also argues that the defendants have special duties that restrict their ability to disclose confidential information. For example, in *Boehner v. McDermott*, the DC Circuit found that a House Representative could be liable for disclosing an intercepted phone recording in violation of his duty of confidentiality under the rules of the House and Ethics Committee. 484 F.3d 573, 580–81 (D.C. Cir. 2007); *see also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1053 (1991) (speech may be subject to restriction if it involves misuse of "information to which [the lawyer] had special access" or "reveal[s] client confidences."). Here, however, the information on the NA documents had nothing to do with any duties of confidentiality the defendants may have had with respect to their legal work. Although Allen is correct that the defendants may be subject to special duties of confidentiality as members of the legal profession,[12] the documents here had nothing to do with their legal work, and are thus not subject to special restrictions on speech.

As discussed above, Allen cannot maintain tort actions arising from the defendants' publications without meeting heightened First Amendment standards, which he cannot do. Therefore, Counts IV, VI, VII and VIII will be dismissed.

---

that WikiLeaks solicited the stolen documents from Russian agents. A person is entitled [to] publish stolen documents that the publisher requested from a source so long as the publisher did not participate in the theft," noting that to hold WikiLeaks "liable for the theft as an after-the-fact coconspirator of the stolen documents . . . would eviscerate *Bartnicki*." *Id.* at 435; *see also Jean*, 492 F.3d at 31. Although the government may make receipt of some information unlawful, *see In re Vericker*, 446 F.2d 244, 248 (2d Cir. 1971), the court notes that the defendants' actions in obtaining the documents here were similar to those in *Jean* and *DNC*. Without deciding whether defendants violated the laws identified by Allen, the court holds that the defendants' publications are protected by *Bartnicki*.

[12] It is not clear if Beirich or Potok were trained as lawyers, but neither is currently a member of the bar. SPLC Defendants' Reply at 10 n. 4, ECF 21.

## V. RICO Claims

Allen alleges that Beirich and Potok have engaged in a pattern of racketeering activity, namely: receipt of stolen property, commercial bribery of a fiduciary, and various instances of mail and wire fraud regarding contact with Dilloway and distribution of publications, including the August 17, 2016, publication and the 2016 Hate Map regarding Allen. Compl. ¶¶ 142–151.

Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To show a "pattern" of racketeering activity, the plaintiff must identify at least two related acts of racketeering activity, occurring within 10 years of each other, and must demonstrate "continuity." *U.S. Airlines Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 318 (4th Cir. 2010) (citing 18 U.S.C. § 1961(5) and *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242 (1989)). Racketeering activity "is defined to include a number of so-called predicate acts," including mail and wire fraud, *Hemi Grp., LLC v. New York*, 559 U.S. 1, 6–7 (2010) (citing 18 U.S.C. § 1961), the interstate transportation of stolen property, and bribery. 18 U.S.C. § 1961(1).

"A civil RICO action 'is a unique cause of action that is concerned with eradicating organized, longterm, habitual criminal activity.'" *Becker*, 2019 WL 1415483, at *13 (quoting *U.S. Airline Pilots*, 615 F.3d at 317). The Fourth Circuit has cautioned against using RICO to capture "ordinary or garden-variety fraud claims better prosecuted under state law," especially when there is only one victim. *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000); *see also Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (allegations

14

of acts occurring over one year, narrowly directed toward a single fraudulent goal, and involving one perpetrator and one set of victims did not state a RICO claim). "RICO is not aimed at the isolated offender." *Becker*, 2019 WL 1415483, at *15 (quoting *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987)).

Although *Food Lion* held that plaintiffs must satisfy First Amendment standards when seeking publication damages under non-reputational *tort* claims, the court sees no reason why Allen should be able to avoid First Amendment standards by seeking publication damages under RICO. As explained above, Allen cannot show the requisite falsity to impose liability on defendants for the publications, as the statements in the publications were either true or non-actionable opinion. Therefore, to the extent that his allegations of mail and wire fraud are based on the August 17, 2016, article or the 2016 Hate Map, these cannot constitute the predicate acts for the purpose of his RICO claim. *See Smithfield Foods, Inc. v. United Food and Comm. Workers Int'l Union*, 585 F. Supp. 2d 815, 821–22 (E.D. Va. 2008) (applying First Amendment standards to RICO claim).

Allen also alleges additional instances of mail and wire fraud when SPLC, under the leadership and management of Beirich and Potok, distributed publications (1) intentionally inflating their hate group tallies, (2) using a definition of hate group at odds with its widely accepted connotation and falsely attributing violent ideology and actions to nonviolent groups and persons, (3) containing intentionally false statements regarding Maajid Nawaz, and (4) containing false statements about Charles Murray, Compl. ¶¶ 146–151, and when SPLC made an allegedly false statement on its IRS Form 990 that it does not "engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office." *Id.* ¶ 150. Allen alleges that SPLC committed mail and wire fraud, as donors were deceived into

15

giving money based on these false or misleading statements. Besides excerpts from several news articles on the SPLC, however, *see id.* ¶ 30, Allen does not provide any factual support for his claim that donors are being defrauded by these allegedly false or misleading publications. Therefore, Allen's claims of mail and wire fraud are not properly pled.

As to Allen's claims regarding the receipt of and payment for the confidential documents from Dilloway, even if true, these alleged predicate acts do not meet the continuity requirement of a civil RICO claim. At most, these alleged predicate acts constitute one single instance of unlawful activity that does not show a pattern of racketeering activity necessary for a RICO claim.

For these reasons, the court will dismiss Allen's RICO claim (Count II) and conspiracy to commit RICO claim (Count III).

## VI. Contract-Related Claims

Allen alleges that Beirich, Potok, and SPLC tortiously interfered with Dilloway's confidentiality agreement with NA (Count V) and aided and abetted his breach of the contract (Count IX), to which Allen was a third party beneficiary, by receiving and using documents from Dilloway protected by the agreement. Compl. ¶¶ 165–169, 193–197.

"Only parties to the contract or economic relationship have standing to bring a tortious interference claim; third-parties who are affected by the wrongful interference may not recover unless they are intended beneficiaries of the relationship or contract." *Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 540 (D. Md. 2006). Under Maryland law,[13]

> An individual is a third-party beneficiary to a contract if the contract was intended for his or her benefit and it clearly appears that the parties intended to recognize him or her as the primary party in interest and as privy to the promise. It is not enough that the contract merely operates to an individual's benefit: An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee.

---

[13] Both parties agree that Maryland law applies.

16

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 457 (2012) (quoting *120 West Fayette St., LLLP v. Mayor of Balt.*, 426 Md. 14, 36 (2012)).

The decisive question is whether the provisions were inserted to benefit the third party, or whether the third party is merely an incidental beneficiary. *Id.* at 458. Courts should look to "the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention." *Id.* at 458 (citation omitted).

Allen asserts that "the employment agreement that Dilloway signed contained extensive confidentiality provisions" which covered "the documents and other information he examined while an employee of the National Alliance." Compl. ¶¶ 56, 166. Allen alleges he was a third party beneficiary of the confidentiality agreements, but nothing in the complaint provides factual support for this. The complaint does not state what the confidentiality agreement allegedly covered, the circumstances of its insertion into the employment agreement, or any other facts that would support the allegation that Allen was an intended beneficiary of it. Although Allen argues in his response to SPLC's motion to dismiss that "it would have been surprising for Williams [chairman of NA] *not* to have protected, by means of a confidentiality agreement, third parties who purchased books, attended conferences, sent money to, or otherwise connected themselves with the National Alliance," (Allen's Opp'n at 27, ECF 16), this is not enough to properly allege that he was a third-party beneficiary. Therefore, because Allen's standing as a third party beneficiary is a requisite to pursue his claims regarding the confidentiality agreement between Dilloway and NA (Count V and Count IX), those claims will be dismissed.

## CONCLUSION

For the reasons stated above, the court will grant the defendants' motions to dismiss. A separate order follows.

_____11/13/19_____          _____/s/ CCB_____
Date                            Catherine C. Blake
                                United States District Judge